## Richmond.

### GARRISON V. HALL AND ALS.

#### January 13.

1. A party claiming title to land, to which he has the legal title to one-third and an equitable title to the other two-thirds, may go into equity to restrain waste upon the land and to set aside a conveyance from the board of public works of Virginia to a purchaser of the land, the same having been previously legally granted by a valid grant.

2. W, proceeding under a warrant from the Commonwealth, has a tract of land surveyed, and applies for a patent in 1803, but the register being in doubt whether the land is not exempt by the act of 1780 from appropriation, as being on the shores of the sea and the bay, &c., W files his bill against the register, and upon the hearing the court decrees that the register shall issue to W a patent for the land, and this is done in 1809. HELD : The decree must at this day be held as conclusive of the questions, whether the land of W embraced in his survey and patent was exempted by the statute from location and grant.

3. The act of 1780 exempts from location and grant all unappropriated lands on the Chesapeake bay, or the sea shore, or on the shore of any river or creek in the eastern part of the State which have remained ungranted, and have been used as a common to all the good people of the Commonwealth. HELD : The preamble of the act shows that it was intended to reserve to the poor and others the privilege of fishing ; and it was only intended to reserve the shores or the lands on the shores necessary for the enjoyment of the privilege.

4. A conveyance by the board of public works to H and F borders on the sea and on the bay, and includes not only the land of the plaintiff, but is of a much larger tract, called the Desert, and the plaintiff asks in his bill that the court will declare such partition of said tract of land (if such partition may be necessary) as may be right and proper to protect the use and privileges of the shores and bays mentioned in the bill, to which said tract adjoined, for fishing thereon, as authorized by law. HELD : The bill is not demurrable for multifariousness.

This was a suit in equity brought in the circuit court of Princess Anne county, but afterwards transferred to the circuit court of the city of Norfolk, by George G. Garrison, to enjoin Thomas M. Hall and John M. Frazier from trespassing upon and cutting and carrying off timber from a tract of land in the county of Princess Anne, situated in what is called the Desert, which the plaintiff claimed belonged to himself and his sister Emily Mullins, the wife of John Mullins, and her children. He prayed that the court would direct an account of the timber carried off by these parties, and would declare the right of the parties interested with him, and that such partition of said Desert land may be made (if such partition may be necessary) as may be right and proper to protect the use and privilege of the shores and bays mentioned in the bill, to which the said tract adjoined, for fishing thereon, as authorized by law.

The plaintiff claimed a tract of two thousand three hundred and ninety acres of land, under a patent which had been issued to Simpson Whitehead in 1809.

The defendants Hall and Frazier answered, contesting the validity of that patent, on the ground that it was upon land which had been exempted from grant under the law in force at the time it was issued; and claiming the land as included in a sale and conveyance to them of the tract called the Desert, in the county of Princess Anne, containing five thousand two hundred and fifty-four acres, by the board of public works of Virginia, by deed bearing date the 4th of February, 1869.

In the progress of the cause the defendant Frazier died, and his widow and heirs, who were infants, were made defendants; and these infants by their guardian *ad litem* demurred to the bill, on the ground that it was multifarious. The plaintiff then filled another amended bill, in which he proposed to omit the prayer for partition of the

land between himself and his sister Mrs. Mullins and her children. And to this bill these infant defendants again demurred for multifariousness, and for want of equity.

The cause came on to be heard on the 12th of June, 1875, when, the injunction having been previously dissolved, the court dismissed the bills as to the defendants Hall and the heirs of Frazier. And thereupon Garrison obtained an appeal from a judge of this court. The case as to the title of the parties is fully stated by *Anderson, J.,* in his opinion.

*James Alfred Jones,* for the appellant.

*William W. Old,* for the appellees.

ANDERSON, J., delivered the opinion of the court.

There was an entry and survey, by virtue of land office treasury warrant, for Swepson Whitehead of 2,390 acres of land in the county of Princess Anne, made by the surveyor of said county, in April, 1803. A plat and certificate of said survey were duly returned to the general land office, and a patent dated June 20th, 1809, issued from the Commonwealth to the said Swepson Whitehead, who thereupon entered and took possession.

The plaintiff claims to be in possession of the said tract of land, and to be jointly invested with the ownership thereof with his sister Emily Mullins and her infant children, by successive conveyances of the title from the said Swepson Whitehead, the pantentee, to Joshua C. Garrison, the grandfather of the plaintiff, who purchased it for his son James S. Garrison, the father of plaintiff, and paid for it with his money, and dying without having conveyed the legal title to his said son, *he* continued in the possession after the death of his father, claiming the exclusive ownership of it

and exercising acts of ownership over it as long as he lived, without objection and with the acquiescence of the other heirs of Joshua C. Garrison, and who have never claimed any interest in it since the death of the said Joshua C. Garrison, and do not now claim any interest; and James S. Garrison by his last will devised it to his wife Eliza Garrison, under whom the plaintiff claims.

The defendants claim to have title to the land upon which they entered and right to the possession by virtue of a deed bearing date the 4th of February, 1869, executed by H. Wells, styling himself governor of Virginia, George Rye, styling himself treasurer *ad interim*, and William F. Taylor, styling himself auditor of public accounts State of Virginia, claiming to be the board of public works, whereby they granted, bargained and sold, with special warranty, to John M. Frazier and Thomas L. Hall, defendants below and appellees here, for and in consideration of $16,000 in old State bonds, all the right and title of the State of Virginia in and to a tract of land lying in the county of Princess Anne, on Chesapeake bay, Atlantic ocean, Linkhorn bay, Broad bay, and Long creek, and known as the "Desert Tract," containing five thousand two hundred and fifty-four acres, more or less. The deed purports to have been executed under authority of the act of assembly passed February 28th, 1866 (Acts of 1865–66, p. 160, ch. 44).

There is not a doubt that the tract of 2,390 acres claimed by the plaintiff as the property of himself and his sister Mrs. Mullins and her children (the boundaries of which as contained in the Commonwealth's grant of 1809 to Swepson Whitehead being clearly established by the survey made in this cause, and other evidence in the record), is included in the said grant of 5,254 acres of the 4th of February, 1869, to said Frazier and Hall. But they claim that the said tract of 2,390 acres embraces and consists of lands which were reserved from grant under land warrant by the act

of May, 1780, which was re-enacted by section 6 of the act of ———, 1796; and that the patent therefor is consequently null and void. To show that said tract of 2,390 acres, or any part of it falls within the reservation or exception of the act of 1780, the *onus* is on them. As a general rule it was held in *French* v. *Bankhead*, 11 Gratt. 136, 168, that "all lands which had never before been patented are to be considered as waste and unappropriated, and are liable to location by any holder of a treasury warrant."

There can be no question that the lands embraced in the grant to Swepson Whitehead were liable to location by the holder of a treasury warrant as waste and unappropriated lands, prior to the act aforesaid of May, 1780; and that they had never been patented prior to the grant to Whitehead; and the question is, were they excepted or reserved by that act or by any subsequent act of the general assembly prior to the emanation of the grant to Whitehead? This involves the construction of those acts.

It appears that the effect and operation of these acts were brought in question, in reference to the entry and survey made by Swepson Whitehead, in this identical case, as early as 1804, and received a judicial construction. From a letter copied in the record it appears that the then register, William Price, was in doubt whether he could issue the patent under the said acts of assembly, and sought the advice of the attorney-general; from whom he received the following letter, addressed to him:

"RICHMOND, October 22, 1804.

"Sir—I duly received your favor of the 4th inst., with its inclosures. From what you represent to be the situation of the land surveyed by Mr. Whitehead, and from information received by me of others, it appears to me that these lands fall within the exception of the 6th section of the 86th chapter of the acts of assembly, as published

by Pleasants and Price, and that the safest course will be
not to issue a grant. Mr. Whitehead will not be injured
by my construction of the law if wrong, because he can
apply to our courts for an exposition of the act of assem-
bly."

    Signed,    " PHILIP NORBORNE NICHOLAS."

 The difficulty, it seems, was as to the construction of the
act of assembly. And Mr. Nicholas seems to have been in
doubt himself, but thought it safest not to issue the patent,
as Mr. Whitehead could apply to the courts in that case,
and have the act of assembly judicially expounded. The
difficulty was not in reference to the facts. The register
seems to have been in possession of them and to have been
informed as to the situation of the land, which he commu-
nicated to the attorney-general; from which, and the infor-
mation he had received from others, it *appeared* to him that
these lands fell within the exception of the act. It is a just
and reasonable conclusion that he was informed as to the
situation of the land and of all the facts, at least so far as
they were adverse to the issuing of the grant, as fully as
they are disclosed by this record; and the only doubt was
upon the construction of the act, whether lands so situated
were within the exception. It appeared to him that they
were. But he was not confident that he was right in his
construction of the act, and thought that the doubts should
be resolved by a judicial construction, and to that end he
advised the register not to issue the patent.

 The register, pursuant to this advice, declined to issue
the patent, and Swepson Whitehead filed his bill in the
superior court of chancery for the Richmond district,
against William Price, register of the land office, and Philip
N. Nicholas, attorney-general for the Commonwealth, the
object of which suit undoubtedly was to obtain a patent
for his said survey. The papers in this cause were de-

.stroyed by the burning of the clerk's office where they were kept, and the only evidence we have of the case is a copy of the decree, which was on file in the land office, and thus preserved; from which it appears that the cause came on to be heard on the 24th of June, 1808, on the bill, answers and exhibits, and was argued by counsel. There appears to have been no depositions taken, which it would seem was unnecessary, as there was no replication to the answers, which doubtless set out the facts and the situation of the lands, as they were understood to be by the register and attorney-general, and which had induced them to decline the issuing of a patent, and which were doubtless as adverse to the issuing of the patent as the situation of the lands and the facts of the case really existing, could be. And it needed no evidence to establish them, as their truth was not denied by the plaintiff. The superior court of chancery, it may be fairly presumed, was in possession of all the facts bearing upon the subject in dispute, which are disclosed by this record, and were probably more clearly presented in relation to the exact situation and boundaries of the land, as the situation of any portion of the lands had not been affected by changes wrought by winds and waves, which probably have been affected through the long lapse of years since. And the facts as stated were derived from those who had a personal knowledge of what they communicated, being living witnesses of what transpired, and having a fresh and clear recollection of what they communicated.

And in construing the acts of 1780 and 1796 and 1802, the chancelor in 1808 being cotemporary with the men of that generation, who were conversant with the state of things in the country, which induced the enactment aforesaid, and especially were informed as to whether said lands had been used as a common to all the good people of this Commonwealth anterior to said act of 9th of May, 1780 (in reference

Garrison v. Hall and als.

to which no person now living or who testified in this cause have any knowledge), had better means of rightly interpreting said act than this court could have after a lapse of a hundred years, except so far as it may derive assistance from the light which may have been shed upon the subject by subsequent judicial interpretation and legislative construction.

The superior court of chancery, on consideration of the case before it, as we have seen upon all the facts as to the situation and boundaries of the said survey, and as to whether the lands it embraced had been used as a common by the good people of the Commonwealth, which it is fair to presume were presented by the bill, answers and ex-exhibits, came deliberately to the conclusion that there was no evidence in the cause that said survey "comprehends unappropriated lands on the bay of Chesapeake, or on the sea shore, or on the shore of any river or creek, which have remained ungranted by the former government, and which has been used by the good people of this Commonwealth." We do not understand the court to say that there was no evidence *on the subject* before it; for the presumption is that the bill, answers and exhibits gave full and ample disclosure of all the facts that existed, and in all probability fuller and clearer and more reliable, especially as to the question whether the lands embraced in Whitehead's survey had been used as a public common, than any evidence after the great lapse of years that can now be produced. We understand the court as holding, not that there was no evidence, but that there was no evidence that the lands excepted from entry, survey and grant by treasury warrant were embraced in Whitehead's survey. To reach that conclusion the court had necessarily to construe the act of 1780, and which was inserted as section 6 in the act of 1796. The act of 1802 is in reference to lands on the western waters.

The court does not state the grounds of its decision, ex-
cept in general terms, that the said survey does not com-
prehend lands on the bay of the Chesapeake, or on the sea
shore, or on the shores of any river or creek, and which
have been used as a common; and decreed and ordered that
Wm. Price, as register of the land office, do make out a
grant, to be laid before the governor for execution, of the
lands comprehended in the survey among the proceedings;
and said patent was accordingly issued, but not until the
26th of June, 1809, there being some additional surveying
necessary in order to close the last line of the survey
before the patent could issue.

The chancellor assigned also a reason, which we do not
mean to omit, though it seems to have no bearing upon the
issue and throws no light upon it, nor even tending to sup-
port his conclusion which he had just decidedly announced,
or to show that it was erroneous, but as an additional rea-
son, as it seems (which was supererogatory), why his conclu-
sion should be carried out in a decree. It is, "that if the
said survey do contain such lands, any grant issued thereon
will be void *as to such* lands." This opinion is not expressed
with regard to the grant for the whole survey, but only as
to such parts as should be shown to lie on the bay, or which
embraced the shores of the Atlantic ocean, or the shores of
rivers or creeks; the opinion is expressed that for *such* parts
the grant will be void, notwithstanding the decree directs
the patent to be issued for the survey. But as the right of
Whitehead to his patent, and whether it could be lawfully
issued, was the question directly in issue, and which was
decided by the court, it would seem to be a *res adjudicata*,
and that whether the patent was lawfully issued is no
longer an open question.

But if this is not so, the decision, we think, under all the
circumstances, is entitled to great weight, for the reasons
already given, both as to the facts of this case and as to a

proper construction of the law. What was the grievance from which this act was designed to afford relief? It was that the riparian proprietors, on the eastern public waters, were entitled to hold exclusive rights and privileges to ordinary low water mark, instead of only to high water mark, as was the law of England, and most if not all of the other united States. And to the extent that the said shores had been appropriated, the public right of fishery was restricted. (1 Lomax Dig. p. 663). As early as 1679, it was ordered and declared by the legislative assembly of Virginia, "that every man's right, by virtue of his patent, extends into the rivers or creeks so far as low water mark, and it is a privilege granted to him in and by his patent; and that therefore, no person ought to come and fish there above low water mark, or haul their seines on shores (without leave first obtained) under the hazard of committing a trespass, for which he is sueable at law." (Id. p. 661).

But when riparian rights had not been acquired by individuals, the public right of fishing existed, and was common to all the people of the State. But by the general act for establishing a land office, and granting waste and unappropriated lands, passed May, 1779, third year of the Commonwealth, 10 H. Stat. at Large, ch. 13, p. 54, any person holding a land warrant was authorized to locate it on any waste and unappropriated lands, and the shores of the Chesapeake bay, of the sea, or of the rivers and creeks, if located there, would be included in his grant down to ordinary low water mark, as they were not excepted by said act; and the remaining public right of fishery, common to all the people of the State, thereby restricted and taken away, the act of May, 1780, was passed in order to preserve that right of common to all the people of the Commonwealth, as plainly appears, we think, from the preamble to the act. It was a matter relating only to riparian rights,

involving the common right of fishing, which the people had been accustomed theretofore to enjoy.

The act of May, 1780 (10 Hen. Stat. at Large, p. 226), is as follows : All unappropriated lands on the bay of the Chesapeake, or the sea shore, or on the shores of any river or creek, in the eastern parts of this Commonwealth, which have remained ungranted by the former government, and which have been used as a common to all the good people thereof, shall be and the same are hereby excepted out of the said recited act ("the act for establishing a land office and granting waste and unappropriated lands"). "And no grant issued by the register of the land office for the same," &c., "shall be valid or effectual in law to pass any estate or interest therein."

"Lands on the bay" does not mean anything more than lands on the "shores," and if they mean lands bordering on the bay or the shores of the sea, &c., what is the limit? How far may they extend back and still be on the shores? May they extend back three or four miles from them and still be on the shores? If so, why may they not extend back thirty or fifty miles and still be on the shores by which they are bounded? They are all unappropriated lands that are intended to be reserved from entry and grant, and although they have areas of hundreds of miles bounded by the shores, if that construction be right they would be exempt from location, and must be kept as a common for fishing, fowling and hunting. Such could not have been the intention of the legislature in 1780, or subsequently. It is in the face of what is known to have been the public policy, to have the country settled and the waste lands appropriated.

The preamble shows that the act was intended to reserve to the poor and others their accustomed privilege of "fishing." It does not even include fowling and hunting, as some of the subsequent acts do. But they include what is

included by the privilege of fishing, and nothing more. It was only necessary to presume that the Commonwealth should reserve from appropriation the shores or the lands on the shores. And it seems to have been so understood by the able and learned revisors of the statute in 1849.

They regarded the rights of common so reserved as aquatic, rather than land rights. In their report to the legislature they placed them under the caption of "water courses." And in the table of contents which they prefixed to the chapter, as they were authorized to do by the law of their appointment, they specify, 1st. "The shores of the bay and seas and beds of rivers ungranted, to remain in common." And section 1, as embraced in their report under the above caption, retains the act of 1780, as modified by the act of 1802, and adds that "any of the people of this State may fish, fowl and hunt on the said shores and beds." As the said revisors were not authorized to propose new laws, though they were the discontinuance of such as were not useful and proper, but to collate the different statutes on the same subject and reduce them to one, to strip the statutes then in force of useless verbiage, and to abbreviate them as far as consistent with perspicuity, without altering their sense, they must have construed the reservation made by said acts to be only of such lands as constituted the shores of the bay and the sea, and the shores and beds of the creeks, as had been used as a common by the people of the State for fishing, fowling and hunting, which would, of course, embrace the lands bordering on the shore, which were necessary for the enjoyment of these privileges. Such was evidently the construction of the revisors, and their report was adopted by the legislature; so that such must also be regarded as the legislative construction.

And such seems to have been the judicial understanding of said acts. In *French* v. *Bankhead, supra*, 136, 139, Allen, J., delivering the opinion of the whole court, describes what

was exempted from grant by those acts as "the navigable waters and the soil under them," which would include "the space between high water and low water marks," which is his definition of the shores (p. 160); which, in view of the intention of the legislature to reserve the privilege of fishing, which had been used in common by the people of the State, would necessarily include the lands bordering on the shores which were necessary for the enjoyment of the privilege. And so we construe the legislation on this subject.

Mr. Whitehead, who appears to have been a man of high character and an intelligent lawyer, must have known of the existence of the acts of May, 1780, and the act of 1796 under which his location was made, and been familiar with its provisions, and he would have been naturally disposed to have his survey made so as not to embrace lands which were exempted from grant by the acts aforesaid. There is no verbal proof of his special directions to the surveyor as avowed in the bill, but the fact that he had the survey so made as that a sufficient space was left between the boundaries of his survey and the shores of the Chesapeake bay, of the sea and the rivers and creeks for fishing, fowling and hunting, shows more conclusively than words could, especially after this great lapse of time, that such were his instructions to the surveyor. George C. Garrison in his first deposition describes the public lands as consisting of the beaches and sand hills and bushy ground bordering the shores of the Chesapeake bay and the Atlantic ocean, beginning at the green hills on the Chesapeake bay and running around the light-house and along the Atlantic coast, the area of which he estimates from ten to fifteen hundred acres. Hooper C. Hicks, the general agent of the defendants, and their witness, states the precise area to be 1,404 acres 1 rood and 15 perches. No part of these lands seem to be embraced in Whitehead's survey. Mr. Garrison, in a

general description of them, represents the starting point a pine near the junction of Long creek and Broad bay, thence along Hubard's line to a point in what is known as the bushy ground in the rear and nearly opposite the centre of Fishery No. 6 ; thence along the bushy ground and the forest in the general direction of Cape Henry light-house, to a point in the rear of Cape Henry light-house ; from thence along the edge of the forest to a point in the rear of the sand hills covering the ocean shore, and about one mile or three-quarters of a mile from the shore ; thence along the lines of other private owners in a zig-zag line, generally westerly, to the point of beginning. And these boundaries, he testifies, excludes what is known as public lands, and their distance from the shores of the Chesapeake bay and the ocean he thinks would average three-quarters of a mile, on the east and west and north of the property. Long creek, Broad bay, and Linkham bay, up to a place called the pond, in sight of the Atlantic ocean, and about a half mile from it, lie south and southwest of said survey, and the space between it and said waters seems to be considerable, and ample for fishing and fowling. And the said Whitehead causing the said survey to be so made and bounded, shows what he understood to be exempted from entry and grant by the act of 1780, and that it was his wish and purpose to exclude it from his survey and grant.

We are of opinion that the object of the act was to reserve the right of fishing, and by a liberal construction, of fowling and hunting, being only coextensive therewith, as a common right to the people of the State, as an aquatic right on the public waters, which embraced the shores and the lands adjacent to them, so far as necessary for the enjoyment of those rights, and to that extent excepted them from location and grant by land office treasury warrant; and that it does not satisfactorily appear from the record that any such lands are comprehended by the Common-

wealth's grant to Swepson Whitehead. But if any part of the shores, and the lands adjacent thereto, which were necessary for the enjoyment of the privilege of fishing, which comprehends all that is meant and required for fowling and hunting, was included in the said Whitehead's survey and grant, at the date thereof, and should be shown to be, the said grant should be declared void as to such part, and is valid as to the residue. But if no such exempted lands at the date of the grant were so embraced, but have been subsequently by the encroachment of the ocean, or bay, and rivers and creeks, the grant for such part was valid when it emanated from the Commonwealth, and must continue to be valid.

But the court below was of opinion that a court of equity had not jurisdiction of this case, and partly on that ground dismissed the plaintiff's bills.

By section 64 of chapter 112 of the Code of 1860, p. 545, it is expressly provided that "the Commonwealth, or any other party, desiring to repeal in whole or in part any grant of land heretofore or hereafter issued, because it was obtained by fraud, or issued contrary to law or to the prejudice of such party's equitable title, may file a bill in equity for that purpose." And the proceedings are required to be as in other suits in equity, " and on the final hearing the court shall make such decree as law and equity may require."

We do not mean to say that every grant of the Commonwealth of lands which had been previously patented, is issued contrary to law, in the sense here used. But the grant to the defendants was made by the board of public works for the Commonwealth, and who had no power or authority except by the act of February 26th, 1866. That act only authorized them to grant the Commonwealth's title to unappropriated lands on the bay of the Chesapeake, the shore of the sea, &c., which remained ungranted according

to the acts of 1780 and 1802. These lands, so far as they were embraced by Whitehead's patent and now claimed by the plaintiff for himself and his sister and her children, were not unappropriated lands. They were not, as we hold, exempted from grant by the act of 1780, or of 1802, and did not remain ungranted according to said acts, but had actually been appropriated by the said Whitehead by grant from the Commonwealth sixty years before the board of public works issued the said grant to the defendants, and which was then a subsisting right in the plaintiff, and had been asserted by him and those under whom he claims by acts of ownership from the emanation of the patent. The board of public works, therefore, in the grant of the lands. which had been previously appropriated exceeded its powers, for it had only authority to grant lands which were unappropriated, and the grant for so much of the lands comprehended in their grant to Frazier and Hall as had been previously granted to Whitehead was issued contrary to law, and is repealable by a court of equity, which has jurisdiction by preliminary injunction, to stay the waste and destruction of the property pending the litigation, "and on the final hearing to make such decree as law and equity may require."

We deem it unnecessary to protract this opinion by the consideration of the interesting question as to the general jurisdiction of a court of equity, to interpose by injunction to stay waste or the destruction of the substance of an estate, whilst the question of title is undecided, which has been argued with ability and learning or both sides, as we think the jurisdiction is clearly maintainable upon the ground on which we have placed it.

The plaintiff, and his sister, and her children have the legal title to only one-third of the land in dispute, but have an equitable title to the remaining two-thirds, the legal title to which remains in the other heirs of Joshua C. Gar-

rison, who are before the court and do not controvert their equitable title.  They hold the legal title in trust for their benefit, which a court of equity will enforce.  But the plaintiff, not having the legal title, would be embarrassed in maintaining an action at law to eject the defendants or to recover damages.  Can it be maintained that the owner of an equitable title to land must stand by, and allow the destruction of his estate by a trespasser, until he can acquire the legal title to enable him to bring an action at law ?   We think not.  There had been no dispute of the plaintiff's title for a period of sixty years, until the interference of the defendants.  All the evidence relied on by the defendants to show that there had been, we regard as wholly unsatisfactory.

We are of opinion that the plaintiff's bill as amended is not liable to the objection of multifariousness, and the demurrer cannot be sustained on that ground, and that the decree of the court below dismissing the plaintiff's bills, whether upon the demurrer, or on the merits, is erroneous; and we are of opinion that the same be reversed, and that the cause be remanded with instructions to reinstate the plaintiff's bills and the injunction, and for further proceedings to be had therein in conformity with the principles declared in this opinion.

The decree was as follows :

The court is of opinion, for reasons stated in writing and filed with the record, that it was error to dismiss the plaintiff's bills either upon the demurrer or upon the merits, or to sustain the demurrer to the said bills upon the grounds of multifariousness.  It is therefore ordered and decreed that the decree of the circuit court of the city of Norfolk, sustaining the demurrers to the bills of plaintiff, and dismissing said bills, be reversed and admitted; and that the

defendants, Thomas L. Hall, Isabella Hall Frazier, Maud Frazier, and McHenry Grafton Frazier, children and heirs of John M. Frazier, deceased, do pay to the plaintiff his costs expended in the prosecution of his appeal here. And the cause is remanded to the said circuit court with instructions to reinstate the plaintiff's bills, and the injunction to restrain the defendants from trespassing upon the lands claimed by the plaintiff during the pendency of this suit; and for further proceedings to be had therein in conformity with the principles declared in the opinion filed with the record, in order to a final decision.

DECREE REVERSED.