## Wytheville.

### THE WAVERLY WATER-FRONT & IMPROVEMENT CO. v. WHITE AND OTHERS.

#### JUNE 15, 1899.

1. RIPARIAN RIGHTS—*Conveyance to High-Water Mark—Effect of—Flats.*
   A conveyance to " high-water mark " as a general rule vests in
   the grantee the right to the soil between ordinary high and low-
   water mark, as incident or appurtenant to the adjacent land. A
   grant may be so limited to "high-water mark" as to exclude
   riparian rights as incident to it, but the intention to do so must
   be clear and manifest upon the face of the deed.
2. RIPARIAN RIGHTS—*Apportionment—Chancery Jurisdiction.*—The ap-
   portionment of riparian rights should be made in accordance with
   the principles established in *Groner* v. *Foster,* 94 Va. 650, and a
   court of chancery is the proper tribunal to make the apportionment.

Appeal from a decree of the Corporation Court of the city of
Norfolk pronounced December 29, 1894, in a suit in chancery,
wherein the appellee White and others were the complainants,
and the appellants and others were the defendants.

*Reversed.*

The opinion states the case.

*Watts & Hatton,* for the appellants.

*R. H. Baker & Son* and *Burroughs & Bro.,* for the appellees.

KEITH, P., delivered the opinion of the court.

It was held by this court in *Groner* v. *Foster*, 94 Va. 650, that "Every riparian owner has the right to the water frontage belonging by nature to his land. This right includes, among others, the right of access from the front of his land to the navigable part of the water course, and also the right to the soil under the water between his land and the navigable line of the water course, whereon he may erect wharves, piers, or bulkheads for his own use, or the use of the public, subject to such rules and regulations as the Legislature may see proper to impose for the protection of the public. In this State, the enjoyment of the right is made subject by statute to the limitation that its exercise shall not result in the obstruction of navigation, nor in other injury to the private rights of any person." Code of Va., sec. 998.

"Each riparian proprietor is entitled, in conformity to such right, to have the extent of its enjoyment upon the line of navigability of the water course determined and marked, and his proper share of the flats, or land under the water, for the purposes aforesaid set apart, and its boundaries defined. A court of equity has jurisdiction, and is the proper tribunal, to make the apportionment, and to determine and establish the boundary lines of the coterminous owners."

Upon the authority of this case we think there was no error in overruling the demurrer to the plaintiff's bill; and we are of opinion that the objection taken by some of the appellants to the decree complained of, that it was made in the absence of certain necessary parties, should also be overruled.

The lots, which are the subject matter of this suit, form the shore of Elizabeth river at that portion thereof known as "Crawford's Bay"; the lots owned by the appellants being on the north side of the city of Portsmouth, and forming the south shore of the bay, while those of the appellees form its west shore. These two shore lines run nearly at right angles to each other, so that the shore lines of the bay may be said to form the right

angle of a triangle, the hypotenuse of which is formed by the port warden's line running from the northeastern corner of the city of Portsmouth to the end of the point on the U. S. Naval Hospital grounds; and with the dividing line between the city of Portsmouth and the county running diagonally through it as shown on map filed with the record. The controversy here is as to the extent of the riparian rights which attached to the lots conveyed to appellees, or those under whom they claim. All the property affected was embraced in the grant from the Commonwealth to William Crawford, dated October 31, 1716. In 1752 the town of Portsmouth, which had been laid out from a portion of this grant, was established, the north boundary of said town being the south shore of " Crawford's Bay." After laying out the town, Crawford sold lots on the north end thereof to sundry parties, privies in estate of the appellants, who are the present owners of these lots, while the lots on the west shore of this bay are the property of the appellees owned by Crawford at his death, and which passed at his death to his devisees, who are the privies in estate of the present owners, the appellees.

Appellees claim that by virtue of their ownership of the land on the west shore they have the right to all of the flats or bottom of this bay to the port warden's line, and to fill in the same and build their structures thereon to said port warden's line to the exclusion of the owners on the south shore of the bay; which assumption is based upon the boundaries given in the several deeds from William Crawford to his immediate grantees, it being claimed that these boundaries were to " high-water mark," and, therefore, the lots so bounded had no riparian rights, while the lots of the appellees were bounded by the river, and hence riparian rights were included therein. The Hustings Court sustained the position of appellees and denied riparian rights to the appellants. In this there was error.

The several deeds under which appellants claim convey to them to " high-water mark," and in the deed to Page and the

Waverly Water-Front and Improvement Company the lines called for are to " high-water mark," " then east on the river side to Daniel Hale's lot    *    *    *    *    with waters, water courses, etc." The deed to the lot to Mary A. Peters uses substantially the same language, so also the deed to the lot on Court street now held by the Waverly Water-Front and Improvement Company, while the conveyance to James Whitehurst of the lot owned by Eastwood is not materially variant from those quoted. These deeds were made prior to 1760.

As early as 1679 it was ordered and declared by the Legislative Assembly of Virginia, that " every man's right, by virtue of his patent, extends into the rivers or creeks so far as low-water mark," and the present statute provides that, subject to certain designated provisions, " the limits or bounds of the several tracts of land lying on said bays, rivers, creeks, and shores, and the rights and privileges of the owners of such lands, shall extend to low-water mark, but no further, unless, where a creek or river, or some part thereof, is comprised within the limits of a lawful survey." Code of Va., sec. 1399; 1 Rev. Code of 1819, ch. 87, p. 341; *Groner* v. *Foster*, 94 Va., at p. 657.

" Thus the limits or boundaries of the several parcels of land under consideration," as was said in the case just cited, " were extended by operation of law, down to the ordinary low-water mark, and the right to the soil between ordinary high and low-water mark annexed as incident or appurtenant to the adjacent land." *French* v. *Bankhead*, 11 Gratt. 160.

*French* v. *Bankhead* is a very strong case. It was decided in 1854 by a unanimous court, and has never been questioned to this day. The State of Virginia agreed to cede to the United States its soil and jurisdiction to the extent of 250 acres at Old Point Comfort, for the purpose of fortification and other objects of national defence, and authorized the Governor to convey the land by deed to the United States. The land is a peninsula bounded by Chesapeake bay, Hampton Roads, and Mill creek.

A survey of the land was ordered by the Governor, and the surveyor was directed to lay off 250 acres as " the United States shall elect to take it." The surveyor returned a plat and report, in which he says that the United States elected to take by high-water mark, and he gives the courses and distances, commencing at a point at high-water mark, and running nearly coincident with high-water mark, except where it runs from Mill creek to the bay, and in that course it stops on the bay at high-water mark. Upon this state of facts it was held that under the act, 1 Rev. Code of 1819, ch. 87, p. 341, which is a virtual reenactment of the Colonial Statute of 1679, " the conveyance by the high-water-mark boundary passed to the United States soil and jurisdiction to the low-water mark."

As we have seen, the act of 1679 was in force when the deeds in question in this case were executed, and upon the authority of *French* v. *Bankhead, supra,* they vested in the grantees the right to the soil between ordinary high and low-water mark as incident or appurtenant to the adjacent land. We do not, of course, mean to say that the operation of the grant may not be so limited to " high-water mark " as to exclude riparian rights as incident to it, but in order to control the operation of the statute of 1679, substantially in force to this day, as construed by this court in *French* v. *Bankhead, supra,* the intention so to do must be clear and manifest upon the face of the deed. The presumption is that the right attached as incident to the grant to " high-water mark "; therefore we hold that, as to these lots, with respect to which the decree of the Hustings Court is silent, it is to be presumed, in the absence of evidence to the contrary, that the original deeds conveyed to " high-water mark," and consequently they will be placed upon the same footing with other lots upon the north side of the city of Portsmouth, and the south shore of Crawford's Bay.

The apportionment of riparian rights should be made in accordance with the principles established in the case of *Groner*

v. *Foster, supra,* of which this is the converse.  In that case the port warden's line was longer than the shore line, while in this the two shore lines are longer than the port warden's line, but the principle established in that case applies with equal force in this.

We are of opinion that the decree of the court below should be reversed, with directions to proceed in conformity with the views herein expressed.

*Reversed.*