# Richmond

Thomas R. Miller v. Commonwealth of Virginia.

November 17, 1932.

Present, Campbell, C. J., and Holt, Epes, Gregory and Chinn, JJ.

The opinion states the case.

*J. M. Turner, Willis D. Miller* and *Leon M. Bazile,* for the plaintiff in error.

*John R. Saunders, Attorney-General, George E. Haw,* and *Haskins Hobson,* for the Commonwealth.

EPES, J., delivered the opinion of the court.

This is a criminal prosecution for unlawful hunting, which turns upon the right of Mr. A. D. Williams to prohibit others from hunting (fowling) between high and low-water marks along that part of his Presque Isle plantation which lies on the tidal reaches of James river about opposite the "Shirley" pier, and approximately one-fourth of a mile above the terminus of the Tidewater and Western Railway (now abandoned) at Bermuda Hundred.

The material parts of section 49, chapter 247, Acts 1930 (§3305 (50), Michie's Code Va., 1930), under which the warrant in the case was issued, reads:

"Any person who shall go upon the private lands, waters, ponds, boats or blinds of another to hunt, trap or fish without the consent of the owner or other person having the legal right to grant the same shall be deemed guilty of a trespass against said owner."

The warrant, which was issued by a justice of the peace for Chesterfield county, charges that on December 20, 1930, Thomas R. Miller did "unlawfully go upon the private land of A. D. Williams to hunt, and did trespass, hunt and fowl on said lands without the consent of said owner and without the consent of any other person having the legal right to grant the same."

Mr. A. D. Williams owns the Presque Isle farm which embraces practically the whole of a large neck of land on the south side of James river in Chesterfield county. This neck, commonly known as "Turkey Island," lies in one of the

great bends of the river. Opposite that portion of the Presque Isle farm which lies farthest downstream is a tidal marsh which is covered with water at ordinary high tide and left dry at low tide. At high tide Miller rowed across from the "Shirley" pier to the opposite side of the river to a point between low and high-water marks in this marsh where the water was several feet deep, there anchored his boat by a weight dropped on the bottom, and put out his decoys on the water around the boat for the purpose, as he states, of attracting wild ducks to this place that he might shoot them. These acts, it is claimed, constituted a trespass upon the property of Mr. Williams and a violation of the statute above quoted.

No patent, or grant, from the London Company, the Crown, or the Commonwealth has been introduced in evidence which could have included within its limits the portion of the Presque Isle farm which lies opposite the place at which this trespass is alleged to have been committed, or whose lines, if extended to low-water mark, could include that place. But there is sufficient evidence to support a finding that Mr. Williams holds that portion of Presque Isle farm by mesne conveyances under a grant from the London Company, or the Crown of England, made prior to 1760, and that the land thereby granted was bounded by the river for some distance both above and below the place at which Miller anchored his boat. *Archer, Adm'r* v. *Sadler,* 2 Hen. & M. (12 Va.) 378; *Carter* v. *Robinett,* 33 Gratt. (74 Va.) 429; *Matthews* v. *Burton,* 17 Gratt. (58 Va.) 317; *McCauley* v. *Grim,* 115 Va. 610, 79 S. E. 1041.

On the other hand, there is no evidence tending to show that the land lying between high and low-water marks which is here involved was ever "used as a common to all the good people" of the Colony or Commonwealth within the meaning of that language as used in the act entitled, "An act to explain and secure the rights of owners of shores on the Atlantic Ocean, the Chesapeake Bay, and the rivers and creeks thereof within this Commonwealth," which was

passed February 16, 1819, Acts 1818-19-20, page 40, Code 1819, chapter 87, which we think is determinative of the question here in issue.

The act of the General Assembly of February 16, 1819, will be better understood if we bear in mind the common law relating to the subject of Crown grant of lands bordering upon tidal waters, the now nearly forgotten history of "commons" or "common lands" during the Colonial period, and certain legislation which preceded it; and before considering the construction and effect of that act we shall advert to these subjects.

At the time Virginia was colonized the common law of England relating to the strip of land lying between high and low-water marks along the tidal waters and to grants thereof had become established to be as is below stated.

The land lying between low and high water was primarily vested in the Crown as a part of its *jus privatum* to the same extent as the highlands adjacent thereto; and the king had the right and authority to grant parcels thereof to private persons for private uses to the same extent that he could grant the adjacent highlands. So long as this strip of land remained ungranted, or unappropriated by the king to uses inconsistent with such use, the people had the use thereof for purposes of navigation and fishing, and upon the same principles, it would seem, also for fowling. But though the king had the right and authority to grant parcels of this strip of land to private persons for private use to the exclusion of the public, the presumption was that he had not done so.

As the presumption was that the king had not granted, and did not intend to include within the limits of a grant made by him, lands lying between high and low-water marks, where the grant called for the sea, or a tidal bay, river or creek, as the boundary of the land granted, the boundary was, as a matter of law, construed to be high-water mark, unless the grant expressly or impliedly showed an intention to make the low-water mark instead of the

high-water mark the boundary called for. The presumption that the boundary was high-water mark was even stronger where the grant described the land as bounded by or on, or running along the shore, beach or bank of the sea, bay, river or creek.

For the strip of land between low and high-water marks to pass under a grant from the Crown, it was necessary that it be included within the limits of the grant, just as necessary as that any part of the highlands should be included within the limits of the grant for the grant to pass it. It could not pass as an appurtenance to the adjacent highlands, for at common law land does not pass as appurtenant to land. The right to make certain uses of land may pass as appurtenant to other lands, but not the land itself.

Where land which reached to a tidal water, either at high-water or low-water mark, was granted, unless the grant expressly or impliedly provided to the contrary, the grantee became entitled to certain riparian rights (as for instance, the right to have access to the navigable parts of the tidal water), as appurtenant to the riparian lands owned by him. But this is very different from the land between low and high-water marks passing as an appurtenance to the uplands adjacent thereto.

When it was established that the Crown had granted a tract of highland and also the adjacent land lying between high and low-water marks, and the grantee, or his successors, thereafter made a grant bounding the land granted by the sea, bay, river or creek, the presumption was different from what it was in the case of a grant from the Crown. Here the presumption was that a person owning both the highlands and the tidal lands adjacent thereto did not intend to separate the uplands from the tidal lands. Therefore, in the absence of an express or implied intention to the contrary, if the grant bounded the land conveyed by or on, or described it as running along the sea, bay, river or creek,

it was construed to call for low-water mark as the boundary of the land granted.

We have forborne the citation of cases on this subject for the reason that our conclusions have been based upon a critical study of the principles which seem to underlie the cases upon this subject rather than upon the pronouncements contained in any one or more cases. The cases upon the subject are readily found by reference to the standard works on the subject; and it would add much to the length and nothing to the clarity of this opinion to enter upon a digest and discussion of them here. See Farnum, Waters and Water Rights; Gould on Waters.

The common law of England was the common law of Colonial Virginia, and after the Revolution became the common law of the Commonwealth; and the rules of law above stated were the rules of law applicable to grants made by the company, the Crown, or the Commonwealth, of lands along the tidal waters in Virginia, unless and until changed, modified, or in effect abrogated by some duly constituted authority.

During its existence the London Company had the power and authority, acting in its corporate capacity at a great and general court of the Company, to provide by ordinance, order, or in any other appropriate manner, that the boundary of grants of tracts of land on a tidal water should be low-water mark, or that a grant of uplands on tidal waters should carry with it as an addendum thereto the grant of the adjacent land lying between high and low-water marks. Likewise, after the charters of the London Company were forfeited and Virginia became a Crown colony in 1624, the king had the power and authority by his letters patent, order or instructions to his governor and council in Virginia, or by order of the lords of his Privy Council, to whom he had committed the administration of the affairs of the colony, to make such a provision. But an extensive search has failed to disclose any indication that either the

London Company or the king ever made any such general provision.

However, some grants were made, the lines of which crossed tidal rivers and creeks, and clearly "comprised within the limits" thereof all or a portion of a tidal river or creek. Such grants at common law passed the title to the land between high and low-water marks within the limits thereof, and were clearly recognized as having done so by the act of February 16, 1819, and subsequent legislation on this subject.

In our examination we have found a few grants of land lying only on one side of a tidal water which state expressly that the land granted, or a part thereof, lay between high and low-water marks. All these are grants of land along the river front at Yorktown or Hampton, and were made during the period 1716-1729. In some of these cases the adjacent land above high-water mark belonged to the person to whom the grant of the land lying below high-water mark was made, but in other cases it belonged to some other person.[1]

There are also some patents to be found whose boundaries are given by courses and distances which would appear to include some tidal marshes within the lines called for.[2]

In addition to the three classes of grants above mentioned, there are also some grants which tend more or less strongly to rebut the presumption that their boundaries were high-water mark, and to show that they included within their boundaries some land lying between high and low-water marks. Most of the grants falling within this last class which we have found are grants of "marsh" lands;

---

[1] See Executive Journals of the Council of Colonial Virginia, vol. 3, pp. 310, 396, 438-39, 449, 453, 546; vol. 4, pp. 183, 184, 207; also following patents: To Wm. Dandridge and Geo. Wythe, July 11, 1719, Pat. B. 10, p. 450, also Pat. B. 11, p. 84; To Henry Irwin, Aug. 20, 1719, Pat. B. 10, p. 450; To James Burtell, Feb. 23, 1714, Pat. B. 10, p. 235; To James Walker, July 12, 1718, Pat. B. 10, p. 375.

[2] See patent to George Wythe for 40 acres "at the north end of Old Point Comfort," dated Aug. 30, 1763, Pat. B. 35, p. 327; patent to Richard Cocke for 270 acres "of swamp, marsh and sunken ground," dated April 28, 1691, Pat. B. 8, p. 157.

and in most cases it would require extrinsic evidence to determine whether marshes which were regularly covered and uncovered by the flow and ebb of the tide were included within the limits of the grant or not.[3]

But patents which, under the common law rules above stated, are susceptible of a construction which includes within their limits land lying between high and low-water marks are the exception, and cover only a very small percentage of the land between high and low-water marks along the tidal waters of Virginia.

One of the most characteristic features of the land-grant system in force during the whole Colonial period was that

[3]The patents below mentioned are examples of this class.

Patent dated March 18, 1662, Pat. B. 5, p. 288, grants to Edward Simpson 100 acres in New Kent county described as follows: "Beginning at a white oak corner by Petico Creek, thence south east 64 poles, thence south west 160 poles to a pine by a marsh, thence up the said creek to the place where it Began." By patent dated April 24, 1669, Pat. B. 6, p. 246, there was granted to Edward Simpson 84 acres of "marsh land lying in New Kent county * * * in several parcels lying upon the ———— side of the said Simpson's land at the mouth of Mattapony river on the east side thereof and bounded by the river and a creek that runeth up between this land the land of Robert Pollard and adjoining to the land of the said Simpson contayning fourteen acres the other parcel being seven acres is bounded on the N. side of York by the said River and by a creek called Peptico Creek and by the south side of the said Simpson's land as thus bounded upon all side."

See also patent of similar nature to Robert Pollard for 65 acres of "marsh land on the North side of Mattapony river" adjoining land of Edward Simpson, dated March 16, 1668, Pat. B. 6, p. 162.

Patent dated April 28, 1692, Pat. B. 8, p. 248, to Daniel Parke grants "all that piece of marsh or sunken ground * * * in York county on the upper side of Queens Creek, containing 74 acres bounded by highlands, from the oyster shell landing upwards, and all along those highlands, till you come over against the landing now or late of Robert Clarke, towards which it butteth south 5 degrees easterly 8 chains to the very edge of the said creek, thence down along the said creek, till you come to the oyster shell landing aforesaid, where it began."

See also the following patents: To John Lewis and James Turner, 1000 acres, May 25, 1654, Pat. B. 4, p. 321; to Colo. Mannering Hammond, 600 acres, Sept. 10, 1658, Pat. B. 4, p. 342; to Thos. Perkinson, 125 acres, Jan. 28, 1662, Pat. B. 5, p. 1; to Wm. Blackey, 1300 acres, Feb. 16, 1662, Pat. B. 4, p. 566; to Capt. Jno. Smith, 500 acres, Feb. 8, 1665, Pat. B. 5, p. 573; to Lawrence Smith, 170 acres, April 20, 1668, Pat. B. 6, p. 144; to John Persons, 650 acres, April 29, 1692, Pat. B. 8, p. 230; to Daniel Parke, 74 acres, April 28, 1692,

the basis of the grant was a land "right"[4] entitling the holder to receive only a given number of acres, not some specific parcel or tract of land. This characteristic of the Colonial land-grant system was incorporated into the first general land-grant law of the Commonwealth enacted in 1779, which adopted the "treasury rights" and "military rights" of the Colonial system as the basis of grants of land by the Commonwealth; and it has remained a characteristic of the general land-grant statutes of the State.

The holder of a "head right," "treasury right," or "military right" was entitled to locate, or make entry upon, any unappropriated lands which were open to patent; and upon having surveyed the number of acres for which he held "rights" was entitled to receive a grant therefor from the governor and council. The quantity of land to which his "rights" entitled him was not dependent upon the quality or value of the land upon which he made his entry. It required the same number of "head rights" to procure a patent for the most useless and valueless swamp or marsh lands that it did to procure a patent for the richest and most valuable highlands along a river.

The right of a holder of a land "right" was so essentially a right to have only a certain number of acres and not a specific parcel or tract of land, that if the boundaries of the grant made to him on the basis of the land "rights" held by him exceeded the number of acres called for by his patent, any other person holding the requisite land

---

Pat. B. 8, p. 248; to Francis Callohill and Giles Tavernor, 48 acres, Nov. 20, 1711, Pat. B. 10, p. 43; to Johnathan Drewett, 47 and 1½ acres, June 22, 1722, Pat. B. 11, p. 141.

[4]There were some exceptions, as, for instance, the grant in 1618 by the London Company to Sir George Yeardley of 2500 acres at "Weynock" (Va. Mag. of His. & Biog., vol. 2, p. 155; Waters of the State by Embrey, p. 13); but, excepting the Northern Neck, most of the lands in Tidewater Virginia were granted on "head rights," that is, the right of the grantee to receive 50 acres of land for his personal adventure into the colony and to receive 50 acres for each person transported by him into the colony at his own cost. It was not until 1699 that "treasury rights" were established, and "military rights" were not granted until a few years later.

"rights" could locate them upon the surplusage within the bounds of the prior grant and procure a patent therefor.[5] However, it would seem that from the earliest time it was the custom of the governor and council to give a grantee, whose patent included such a surplusage, the opportunity to acquire, if necessary, and locate additional "rights" upon the surplusage before permitting another to procure a patent for it; and later it was provided by statute that such an opportunity should be given the first patentee, before permitting another to procure a patent for the surplusage within the bounds of his grant.

Throughout the Colonial period lands were not owned in fee simple. They were held of the king in free and common socage, and except in the case of "ancient adventurers and planters" who had come over at their own expense, the service required of the holders of lands held under "head rights" was an annual free (or quit) rent at the rate of one shilling for each fifty acres whatever might be the character of the land granted.

Along the sea, bays, rivers and creeks of Tidewater Virginia were thousands of acres of mud flats and tidal marshes which were overflowed at ordinary high tide. Such lands were practically worthless to the early inhabitants, who were seeking arable lands and no fowling preserves. These flats and tidal marshes were subject to patent just as were the adjacent highlands; but, if included within the limits of a patent granting the adjacent highlands, they consumed just so much of the patentee's land "rights," and thereby reduced the amount of arable land to which he became entitled. It also entailed upon him the yearly quit rent upon lands which were practically worthless to him. Therefore, it would have been surprising had the patentees of high-

[5]See patent to Thomas Creeton and Hugh Roye, Nov. 6, 1666, Pat. B. 6, p. 13, granting 1800 acres, "400 acres of the said 1300 acres being marsh on the north side of York River;" and patent to Thomas Bell, Dec. 11, 1667, Pat. B. 6, p. 91, for 160 acres, "being the surplusage of the marsh belonging to Hugh Roy and Thomas Creeton being done by order of the general court upon the petition of the said Bell."

lands bordering upon tidal waters as a general rule located their land "rights" in part upon these mud flats and tidal marshes and had them included within the boundaries of the surveys upon which they procured their patents.

We have examined a large number of the patents to land in Tidewater Virginia which were granted both before and after 1679; and we think that the conclusion is irresistible that, with comparatively few exceptions, the grantee so located the land to which he was entitled under his land "rights" as to give him the number of acres to which he was entitled above the high-water mark. Where this was done it would seem to support effectively the presumption of the common law that the grant did not include within its limits the adjacent land lying between high and low-water marks.

In this connection it is interesting to note the series of acts passed by the General Assembly which forbade the taking up of "any marshes, swamps, or sunken lands, adjoyning to any man's land" until one year's notice had been given to the owner of the adjacent highlands and an opportunity afforded him to take out a patent therefor. The necessity for these acts is an interesting side light on the question here under discussion, and would seem to show that patentees were reluctant to include within the limits of their patents "marshes, swamps and sunken lands" except where necessary to prevent some other person procuring a patent therefor to the prejudice of their highlands. The first of these acts is the act of 1672, 2 Hening's St. at Large, p. 300. See, also, act of 1692, 3 Hening's St. at Large, p. 101; act of 1705, 3 Hening's St. at Large, pp. 304, 307, annulled by order of the Queen; act of 1710, 3 Hening's St. at Large, pp. 517, 524-529; act of 1779, 10 Hening's St. at Large, p. 61; act of 1784, 11 Hening's St. at Large, p. 371.

■■ Our conclusion is that comparatively few of the grants made by the London Company, the Crown, or the Commonwealth, pass, *under the common law rules,* the title

to land lying between high and low-water marks. But it is insisted that the action taken by the Colonial General Assembly in 1679, in the *Robert Liny Case,* had the effect of extending the limits of all grants theretofore or thereafter made of lands on a tidal water to low-water mark. This order, which is printed in 2 Hening's St. at Large, p. 456, reads as follows:

"Robert Liny haveing complained to this grand assembly, that whereas he had cleared a ffishing place in the river against his owne land to his greate cost and charge supposing the right thereof in himselfe by virtue of his patents, yett neverthelesse severall persons have frequently obstructed him in his just priviledge of ffishing there, and in despight of him came upon his land and hale their sceanes on shore to his greate prejudice, aleadging that the water was the kings majesties, and not by him granted away in any pattent, and therefore equally free to all his majesties subjects to fish in and hale their sceanes on shore, and praying for releife therein by a declaratory order of this grand assembly; *it is ordered and declared by this grand assembly* that every mans right by vertue of his pattent extends into the rivers or creekes soe farre as low water marke, and it is a priviledge granted to him in and by his pattent, and that therefore noe person ought to come and ffish there above low water marke or hale their sceanes on shoare (without leave first obtained) under the hazard of committing a trespasse, for which he is sueable by law."

This order has been referred to, cited, and to some extent commented upon in several cases; but in none of them has the judgment of the court been rested thereon, or the determination of its nature, force and effect been necessary to a decision of the case.

The earliest case in which we have found a citation of the *Robert Liny Case* is in the opinion of Judge Robertson in *Com.* v. *Garner,* 3 Gratt. (44 Va.) 655, 697. While Judge Robertson dissented from the opinion of the majority of the court as to the immediate question for decision in that

case, there is nothing in the opinions of the other judges which conflicts with what he had to say with reference to the nature of the action of the General Assembly upon the petition of Robert Liny, which is as follows:

"I have found no legislation directly recognizing low-water mark, except a resolution of the Grand Assembly in 1679, and the comparatively late act of February, 1819. The resolution was inserted in Hening's general collection, taken from a manuscript copy of the laws. 2 Hen. Stat. 456 and note. It seems rather a judgment than a law, pronounced on a petition of an individual; though it is called a declaratory order, and in general terms declares that 'every man's right in vertue of his pattent extends into the rivers and creeks soe farre as low water marke,' etc. Neither the resolution itself, nor the principle it asserts, is to be found in any of the numerous editions or revisals of our laws. If it was ever the law, I regard it as long obsolete, or as repealed by the act of 1780."

In *Groner* v. *Foster*, 94 Va. 650, 657, 27 S. E. 493, 496, it is said: "As early as 1679, it was *ordered and declared* by the Legislative Assembly of Virginia, that 'every man's right, by virtue of his patent, extends into the river or creeks so far as lower water mark,' &c." In *Waverly Water Front, etc., Co.* v. *White*, 97 Va. 176, 180, 33 S. E. 534, 45 L. R. A. 227, and *Taylor* v. *Commonwealth*, 102 Va. 759, 770, 47 S. E. 875, 102 Am. St. Rep. 865, this order is cited and denominated as an *"act."* In *Whealton* v. *Doughty*, 112 Va. 649, 654, 72 S. E. 112, 114, it is said that "the marsh in dispute belongs to Scott by virtue of the *statute* of 1679, now section 1339, Code of 1904." In *Steelman* v. *Field*, 142 Va. 383, 389, 128 S. E. 558, 560, it is said that "the original of that statute" (section 3574, Code 1919) "appears to have been first enacted in 1679 (2 Hen. Stat. 456), and provided that the fee simple title of the owners of land on 'rivers and creeks' should extend to low-water mark."

Though the order entered in the *Robert Liny Case* has

been referred to in the cases cited as an "act" or a "statute," and though there were some "orders" entered by the General Assembly during the period 1654-1680 which had the effect of enacting laws, a careful and extensive examination of the subject leads us to the conclusion that the action taken by the General Assembly in response to the petition of Robert Liny was merely a declaration by the General Assembly of its opinion as to what it then conceived to be the existing law upon the subject dealt with therein; and that it neither had, nor was intended to have, the force and effect of the enactment of a law.

Practically all the authorities are agreed that up to the time of the entry of the Robert Liny order a grant of land bounded by a tidal water did not include the land below high-water mark or grant the exclusive use of the waters covering at high tide the adjacent strip of land between high and low-water marks. Therefore, if it was the intention of the General Assembly by the Robert Liny order to make a legislative enactment extending prior grants so as to include the adjacent land between high and low-water marks, or providing that prior grantees should be given the exclusive use of the strip between high and low-water marks and of the waters covering it at high tide, it undertook by its order to make wholesale grants of lands and of rights which constituted a part of the *jus privatum* of the king which it was his prerogative to grant or not to grant as he saw fit. That it should have attempted to do this by entering an order instead of the passage of an act is out of harmony with what appears to have been the conception of the time with reference to the functions of an order and of an act, respectively,[6] and the limitations upon its powers[7] which were recognized by the General Assembly.

[6]See Journals of House of Burgesses, edited by H. R. McIlwaine, 1659/60-1693, p. XXXI; Notes to 2 Hening's St. at Large, p. 455, where, in a note to the orders of the session of 1679, at which session the Robert Liny order was entered, it is said: "These *Orders or Resolutions* are to be found in the Northb. MS. only."

[7]See action of the House of Burgesses of October 29, 1666, 2

As indicated by Hening in his notes heretofore quoted in note 6, and as specifically pointed out by Judge Robertson in his opinion in *Commonwealth* v. *Garner,* 3 Gratt. (44 Va.) 655, 697, neither the order entered upon the Robert Liny petition nor the principle it asserts was included in any subsequent codification or compilation of the statute laws of the colony, though between 1679 and the Revolution there were nine codifications or compilations published. (See History of Virginia Codification by Wm. E. Ross, 11 Va. L. R. 80, and preface to Code 1849.) Of these codifications, the revisions of 1705 and 1748 (printed in 1752) were made by a joint committee of the Council and House of Burgesses. Had the Robert Liny order been then considered as a valid, subsisting, statutory enactment extending the boundaries of all patents theretofore or thereafter made to low-water mark, it would seem reasonable that it, or the principle it asserts, would have been incorporated in the revisions of 1705 and 1748.

In this connection it is to be further noted that the preamble to the act of February 16, 1819 (chapter 87, page 341, Rev. Code 1819), hereinafter quoted, clearly indicates that at that time the General Assembly did not understand that the rights below high-water mark of the owners of land along the tidal waters of the Commonwealth had been settled by any statutory provision on the subject.

As a judgment, the Robert Liny order was plainly of no force and effect, as there was no action or other judicial proceeding pending before the General Assembly in which to enter a judgment.

For the reasons above stated, we are of opinion that the Robert Liny order was not a legislative enactment which changed the rules of the common law relative to crown grants of land on tidal waters. But, though this be true, it would seem to be evident that the claim was generally made by those holding grants of land bordering on tidal

Hening's St. at Large, p. 253, declaring that matters relating to grants of land are vested in the Governor and Council to the exclusion of the House of Burgesses.

waters that by virtue of such grants their rights extended to low-water mark; and the act of February 16, 1819, would appear to be a legislative recognition of the rights which the owners of land upon the tidal waters had long claimed, and was probably a reasonably accurate definition of the rights claimed. Such claim, however, was not sufficient to vest the rights claimed in the owner of the adjacent highlands.

The statutes enacted by the General Assembly of the Commonwealth will be better understood after we have considered the information now available with reference to "commons" or "common lands" in Tidewater Virginia during the Colonial period. The information on this subject is meager, and most of it is to be found in Brown's "The First Republic in America" and Embrey's "Waters of the State," to which we refer; but it is sufficient to throw an important light upon the meaning and proper construction of the Acts of 1780, 1792 and February 16, 1819, to which reference is hereafter made.

The instructions from the London Company to Sir George Yeardley, its Governor in Virginia, dated November 18, 1618 (Va. Mag. of Hist. & Biog., vol. 2, p. 155; Waters of the State, p. 9), directed the Governor and Council to lay out by metes and bounds the following public and common lands: 3000 acres near James river to be called the "Governor's Land;" in each of the "four cities or boroughs, namely, James Town, Charles City, Henrico and the Borough of Kiccotan" 3000 acres to be called the "Company's Land," 1500 acres "to be the common land of the said city or Borough," and 100 acres of glebe land; and for the college, 10,000 acres in Henrico.

The "Governor's Land" and the "Company's Land" were to be occupied and worked during their period of indenture by persons brought over by the Company at its expense, one-half of the profits going to the tenants and the other half to the Governor or to the Company as the case might be. The purpose for which the "common land of the said

city or Borough" was to be laid out and set apart was "for a further ease to the Inhabitants of all taxes and contributions to support and for the Entertainment of the particular magistrates and officers and of all other charges to the said cities and Boroughs respectively belonging."

In addition to the "four cities or Boroughs" these instructions refer to certain "particular Plantations" which had been settled or were in process of settlement under "grants from us in general words unto themselves" (*i. e.,* the grantees named) "and their associates," and mentions as example of such "particular Plantations" Smith's Hundred, Martin's Hundred and the plantations of Captain Samuel Argall, Captain John Martin, Lord Lawar and Christopher Lawne. With reference to these plantations the instructions to Governor Yeardley contained this provision.

"We further ordain that to all such of the said particular .......... as shall truly fully observe the orders afore and hereafter specified there be allotted and set out over and above our former Grants one Hundred Acres of Glebe Land for the ministry of every ........ and fifteen hundred acres of *Borough Land* for the publick use of the said Plantation, not intending yet hereby either to abridge or enlarge such Grants of Glebe or *common Land* as shall be made in any of our grants in writing to any of the said particular plantations." (Italics ours.)

Grants were made by the London Company for the establishment of a number of such plantations both before and after November 18, 1618. (See Brown's First Republic, pp. 308, 314 and 628.)

From the instructions to Governor Yeardley it would appear probable that in each of these "particular plantations" there was laid out and set aside a tract or tracts of "common land" either by the Governor and council, or, perhaps, by the grantees named in the grant for the "particular plantation." However, as only a few fragmentary remnants of the records of the meetings of the Governor and

Council during the early years of the Colony are preserved (so far as seems to be known to students of this period), and as comparatively few of the grants made by the Company are now to be found, we have not been able to ascertain the number and location of the several tracts of "common land" which were set apart in the several plantations and hundreds.

Brown in his "First Republic" says that at the time the Colony was returned to the Crown the 3000 acres of "Governor's Land," the 10,000 acres of college land, the 3,000 acres of "Company's Land" and 1,500 acres of "common land" in each of the four boroughs, as well as 500 acres in Charles City belonging to the secretary's place, had been laid out. He also gives the approximate location of these several tracts, but does not give the source of his information. He also says that on the Eastern Shore "the Company's and secretary's tenants were there seated on the respective lands; but it had not been laid out (surveyed) for them as in the other four corporations." Brown's First Republic, pp. 322-323, 617-625.

In 1631 (some six years after Virginia had become a Crown colony), "about fiftie acres of land (was) given by order of the Governor and council ........ for a common unto the inhabitants of ........ Stanly Hundred," which was in what is now Warwick county; and this common land was confirmed to them by a judicial order of the General Assembly entered at its March session 1659-60. (1 Hening's St. at Large, p. 548.) From this it would appear probable that other "common lands" in Tidewater Virginia were set apart by order of the Governor and Council during the early years of the colony under the Crown.

The land at Old Point Comfort was, from prior to 1631-32, held as public land, and in 1631-32 the House of Burgesses petitioned the Privy Council "that the lands adjoyning to poynt comfort land and now leased to severall men may wholly be converted to that purpose" (i. e., the maintenance of the fort there). (Journals House of Bur-

gesses of Va. 1619-1658/59, edited by McIlwaine, p. 55.) There was also a large body of land bordering upon the seashore near Cape Henry which was "common land," but of its origin as "common land" little seems to be known. (See *Garrison* v. *Hall*, 75 Va. 150; Embrey, Waters of the State, p. 226.)

During the Colonial period the Governor and .Council determined in each case whether a patent should be granted for the particular lands for which a holder of land rights sought a patent, and lands could be as effectually held for use in common by the people by merely refusing to issue a patent therefor as by an order entered by the Governor and Council. It may, therefore, have been, as would seem to be probable, that in addition to such parcels of land as had been expressly laid out as "common land" by order of the Governor and Council there were other parcels of land bordering upon the tidal waters of Virginia which had come to be used as commons by the people, and for that reason had been withheld from grant by the Governor and Council.[3]

Brown in his First Republic, page 627, classes as "public lands" the lands laid out at the direction of the London Company "for the company, colony, church, university, college and free school;" and says of them: "With the exception of the glebe lands, which continued to belong to the church, and the Governor's lands, which I think continued to belong to that office, the public lands passed to the crown and were afterwards parceled out and granted by patents as other lands."[9] But he makes no reference to what became of the "common lands."

Embrey in his Waters of the State, page 225, after re-

[8]The writer has been advised that within the memory of men now living that there was in the Guinea section of Gloucester county a tract of land known as "The Commons," which was used as a common by the inhabitants; but we have found no reference to it in our examinations.

[9]The grant made to Wm. Clarke, dated May 6, 1638, for 1100 acres of land in Henrico county describes the land as "butting north upon the Commons." (Pat. B. 1, p. 547); and the "Governor's Land" seems to have remained ungranted as late as 1666. (2 Hening's St. at Large, p. 253.)

ferring to several acts authorizing the sale of certain "public lands," says that he has found no legislative authorization of the sale of the "common lands" prior to the act establishing the land office which was passed in May, 1779, and we have found none in our search. But it is not improbable that some of the common lands had fallen into disuse as commons during the Colonial period and been granted to patentees as waste and unappropriated land, as Brown states was the case with reference to the Company's land and other public lands above mentioned.

In addition to these tracts of "commons" or "common lands," there seem also to have been certain places along the shores of the tidal waters which had come to be used as public seining places, although the adjacent highland had been granted to some individual. Perhaps it is to such public seining places that reference is made in the resolution of the House of Delegates of December 17, 1819, which was adopted upon the petition of Thomas Means. (Journal House of Del. 1819-20, p. 41.)

We now turn to the statutes enacted by the General Assembly of the Commonwealth which have a bearing on the question here at issue.

From 1776 to 1779 there was no general statutory provision made by the Commonwealth of Virginia for making grants of land to private persons, and such a grant could be made only by some special act of the General Assembly making a grant to the individual or in pursuance of a special act authorizing such a grant to be made. But at its May session, 1779, the General Assembly passed two general acts relating to making grants of land: (1) "An act for establishing and maintaining a land office, and ascertaining the terms and manner of granting waste and unappropriated lands," (10 Hening's St. at Large, p. 50); and (2) "An act for adjusting and settling titles of claimers to unpatented lands under the present and former government, previous to the establishment of the Commonwealth's land office." (10 Hening's St. at Large, p. 35.)

The second of these acts provided for carrying into grant certain unpatented lands to which prior incomplete rights had been regularly acquired by individuals, or for which individuals had claims which the act recognized as entitling them in good faith to receive grants therefor. There is nothing, however, in this act which bears upon the questions here in issue.

The act for establishing a land office established the general land-grant system of the Commonwealth, which in so far as its main features are concerned, has remained in force to the present time. It authorized grants to be made of "waste and unappropriated lands" through the land office, and provided the terms and conditions upon which grants thereof should be made, and the manner in which such grants might be procured. It made no provision for a grant of any lands except "waste and unappropriated lands" and, therefore, by necessary implication excluded from grant under it any lands not falling within the meaning of the words "waste and unappropriated lands." It did not, however, expressly except from the terms of the act any lands in Tidewater Virginia except such lands as fell within the exception of "lands reserved by act of Assembly for any particular nation or tribe of Indians."

The act contains no definition of the terms "waste and unappropriated lands." It would seem clear that these terms did not include lands which had been expressly appropriated for the use of the government or which were being so used though not expressly appropriated for such use.[10] But from the language of the next act to which reference

---

[10]See *French* v. *Bankhead*, 11 Gratt. (52 Va.) 136; *Garrison* v. *Hall*, 75 Va. 150; Act of 1784, authorizing commissioners to sell the public lands in and near Richmond, 11 Hening's St. at Large, p. 399; Act of 1784 appointing commissioners to make sale of "all the public lands in this commonwealth, except those hereinafter mentioned," 11 Hening's St. at Large, p. 405; Acts of 1784-85, authorizing commissioners to sell public lands at Gosport, 11 Hening's St. at Large, p. 497; Act of 1785, authorizing commissioners to sell "the public lands lying in the counties of York and Elizabeth City, except a point of land in the last mentioned county, called Point-Comfort," 12 Hening's St. at Large, p. 97; Act of 1787, authorizing com-

is made, it would appear that those terms as then understood included the "common lands" to which reference has been heretofore made, or certainly such of them as had not been expressly appropriated by an order of the governor and council or some other agency of the Crown as "common lands," or were used for governmental purposes. See Embrey's Waters of the State, page 213-229.

In 1780, the attention of the General Assembly seems to have been called to these "common lands," perhaps by attempts to procure a grant for some of them or by grants having been issued for some of them, and at its May session, 1780, it enacted the following statute entitled, "An act to secure to the publick certain lands heretofore held as common:"

"1. Whereas certain *unappropriated* lands on the *bay, sea,* and *river shores,* in the *eastern parts of this commonwealth,* have been heretofore *reserved as common to all the citizens thereof,* and whereas by the act of general assembly entitled 'An act for establishing a land office, and ascertaining the terms and manner of granting waste and unappropriated lands,' no reservation thereof is made, but the same is now subject to be entered for and appropriated by any person or persons; whereby the benefits formerly derived to the public therefrom will be monopolized by a few individuals, and the poor laid under contribution for *exercising the accustomed privilege of fishing:* Be it therefore enacted by the General Assembly, That *all unappropriated lands on the Bay of Chesapeake, on the sea shore, or on the shores of any river or creek in the eastern parts of*

---

missioners to sell "the public lands lying in the counties of James City and Northampton, formerly annexed to the office of secretary," 12 Hening's St. at Large, p. 495. See also Act of 1789 (13 Hening's St. at Large, p. 3), authorizing the governor to convey to the United States for a lighthouse "so much of the public lands, not exceeding two acres, situate * * * in the county of Princess-Anne, at a place commonly called the head land of Cape Henry," which provided that "the citizens of this Commonwealth shall not, in consequence of this cession, be barred from the privilege they now enjoy of hauling their seines and fishing on the shores of the said land so ceded by this act to the United States."

*this commonwealth, which have remained ungranted by the former government,* and *which have been used as common to all the good people thereof,* shall be, and the same are hereby excepted out of the said recited act, and no grant issued by the register of the land office for the same, either in consequence of any survey already made, or which may hereafter be made, shall be valid or effectual in law, to pass any estate or interest therein." 10 Hening's St. at Large, page 226. (Italics ours.)

After an extensive examination made to ascertain the background of the act of 1780 and the act of February 16, 1819, we are of opinion that the act of 1780 had no *general* reference or application to the strip of land lying between low and high-water marks along the tidal waters of the Commonwealth, but applied only to tracts of land which had been theretofore designated as a common for the use of the people, or which, though they had not been expressly designated as a common, had been used by the people as a common and come to be recognized as such. "Common" is here used in a more restricted and specific sense than that in which it is used when it is said that the people had the right in common to fish and hunt upon all ungranted lands. The act reserves from grant the tracts of land on the tidal waters which had been used as a common, not merely the land lying between low and high-water marks which had been used as common; and the reservation of the adjacent land between low and high-water marks is an implied rather than an express reservation. *Garrison* v. *Hall,* 75 Va. 150, 160, 161.

On December 17, 1792, the General Assembly passed an act entitled, "An act for reducing into one the several acts concerning the land office; ascertaining the terms and manner of granting waste and unappropriated lands," etc., which provided that it should be in force from and after its passage, and repealed "all and every act and acts, clauses and parts of acts within the purview of this act." Section 6 of this act reads as follows:

"Provided also, That all unappropriated lands on the bay of Chesapeake, on the sea shore, or on the shores of any river or creek, *and the bed of any river or creek* in the eastern parts of this Commonwealth, which have remained ungranted by the former government, and which have been used as a common to all the good people thereof, shall be, and the same are hereby excepted out of this act; and no grant issued by the register of the land office for the same, either in consequence of any survey already made, or which may hereafter be made, shall be valid or effectual in law to pass any estate or interest therein." (Statutes at Large (N. S.), vol. 1, 1792-1795, p. 65.)

This is the act of 1780 with only one change, the insertion of the italicized words. Plainly the amendment is an enlargement of the scope of the act of 1780; and upon analysis it is seen that it prohibits the granting, under the general land-grant laws, of (1) the tracts of land which are reserved from grant by the act of 1780; and (2) of the beds of any river or creek in the eastern parts of the Commonwealth which have been used as a common to all the good people thereof.

The acts of 1780 and 1792 related only to the "eastern parts" of the Commonwealth; but on January 15, 1802, the General Assembly amended section 6 of the Acts of 1792 by the addition of a provision which reserved from grant "the banks, shores, and beds of the rivers and creeks in the western parts of the Commonwealth." Section 6 of the Acts of 1792, as amended by the act of 1802, remained in force unchanged until January 1, 1820. (See act of March 1, 1819, Rev. Code 1819, c. 86, secs. 6, and 81-82.)

On February 16, 1819, the General Assembly passed the act (effective April 1, 1819) entitled, "An act to explain and secure the rights of owners of shores on the Atlantic Ocean, the Chesapeake Bay, and the rivers and creeks thereof within this Commonwealth," which we think, is conclusive of the questions here in issue. The material parts of this act read:

"Whereas doubts exist how far the rights of owners of shores on the Atlantic Ocean, the Chesapeake Bay and the rivers and creeks thereof, within this Commonwealth, extend; for explanation whereof, and in order effectually to secure said rights;

"1. Be it enacted by the General Assembly, That hereafter the limits or bounds of the several tracts of land lying on the Atlantic Ocean, the Chesapeake Bay, and the rivers and creeks thereof within this Commonwealth, shall extend to ordinary low-water marks; and the owners of said lands shall have, possess and enjoy exclusive rights and privileges to, and along the shores thereof, down to ordinary low-water mark; provided, That nothing in this act contained shall be construed to affect any creek or river, or such part thereof, as may be comprised within the limits of any survey; and, provided, also, that nothing in this section contained shall be construed to prohibit any person or persons from the right of fishing, fowling and hunting on those shores of the Atlantic Ocean, Chesapeake Bay, and the rivers and creeks thereof, within this Commonwealth, which are now used as a common to all the good people thereof; *nor to repeal the sixth section of an act, entitled, An act for reducing into one the several acts concerning the land office; ascertaining the terms and manner of granting waste and unappropriated lands; for settling the titles and bounds of lands, directing the mode of processioning, and prescribing the duty of surveyors, passed the seventeenth day of December, one thousand seven hundred and ninety-two.*" (Italics ours.)

The act of 1780 and section 6 of the act of 1792 apply only to grants issued after the respective dates of their passage, by the register of the land office under the general land-grant law provided by the Acts of 1779 and 1792. Therefore, in considering the effect of the act of 1819 on grants made prior to 1780, the act of 1819 is to be construed as if the underscored proviso were not contained in the act. It is, therefore, without point here to consider the

meaning of the words "and the bed of any river or creek" as used in section 6 of the act of 1792, which has been argued at length in the briefs.

When the act of 1819 is read without the proviso which we have above italicized, we think it plain that the meaning and effect of this act, in so far as it related to grants made by the London Company, the Crown, or the Commonwealth prior to May, 1780, is this:

Wherever the land granted was bounded by a tidal water so as, under the common law, to pass title to high-water mark, this act extended the limits of the grant to ordinary low-water mark; granted to the grantee, or his successor in title, the fee simple title to the strip of land along his tidal water frontage which lay between high and low-water marks, and, with the exception below mentioned, vested the grantee, or his successor in title, with the exclusive right to use and enjoy that strip of land and the waters which cover it at high tide, subject only to the right of the public to use the waters covering it at high tide for purposes of navigation to certain extents and under certain limitations, which it is not necessary here to discuss. The exception above mentioned is this: Where the extension of any such grant to low-water mark would include therein any land lying between low and high-water marks which was at that time "used as a common," the public should continue to have and enjoy the right of fishing, fowling and hunting thereon.

■ Act act of February 16, 1819, was, in effect, a grant by the Commonwealth to every person owning land bounded by a tidal water under a grant theretofore issued; and such grantees could not thereafter be deprived by any subsequent legislation of any of the rights thereby granted.

■ "Where valid grants are once made by the State the property granted can only be resumed by it when needed for the public use, under the right of eminent domain, upon making compensation." *Newport News* v. *Jones,* 105 Va.

503, 513, 54 S. E. 314, 317, 6 L. R. A. (N. S.) 247; *Langdon v. Mayor*, 93 N. Y. 129.[11]

We are, therefore, of the opinion that there is no error in the judgment of the trial court; and the judgment appealed from is affirmed.

The statutes which had their origin in the acts of May, 1780, and February 16, 1819, have undergone some important changes,[12] and in what has been above said we express no opinion with reference to the meaning or proper construction of these later acts, or of the effect of the act of February 16, 1819, in so far as it relates to grants made after May, 1780.

*Affirmed.*

CAMPBELL, C. J., concurs in result.

---

[11]It is interesting to note that paragraph 37 of the instructions from Charles II to Lord Culpeper, dated January 27, 1681-2, read as follows: "Our will and pleasure is and we doe hereby require and command you that noe man's Life, Member, Freehold or Goods be taken away or harmed in Our said Colonie but by established and known Laws not repugnant to but as much as conveniently may be agreeable to the Laws of Our Kingdom of England."

[12]For the subsequent statutes see Rev. Code 1819, c. 86; Code 1849, c. 62, §§1 and 2; Code 1849, c. 112, §4; Acts 1850-51, c. 41, p. 33; Acts 1857-58, c. 40, p. 44, which is incorporated in Code 1860, as §43, c. 112; Acts 1865-66, c. 44, p. 160; Acts 1866-67, c. 34, p. 804; Acts 1870-71, c. 79, p. 136; Acts 1872-73, c. 333, p. 310; Code 1873, c. 62, §§1 and 2; Code 1873, c. 108, §43; Code 1873, c. 101; Code 1887, §§1338, 1339, 2341; Code 1919, §§459, 3573, 3574.