# CIRCUIT COURT OF THE CITY OF NORFOLK

City of Virginia Beach

v.

Nala Corp.,
Fala Corp.,
Kana Corp.,
and Edwin B. Lindsley, Jr.

Case No. (Chancery) C99-450-02

BY JUDGE CHARLES E. POSTON

September 29, 2000

Today the Court holds that its order of January 13, 1995, appointing a receiver for Virginia Beach Holding Corporation, should be vacated because it was procured by the fraud of the defendants Edwin B. Lindsley, Jr., and Nala Corporation and that the deed given by the receiver thereby appointed should be declared null and void. The Court also holds that none of the defendants owns or has any interest, through Soames Corporation, in land east of the platted lots between 5th Street and Rudee Inlet in the City of Virginia Beach. The court has considered the evidence heard *ore tenus*, the exhibits filed, the argument of counsel, the written submissions of the parties, and the results of its own research.

*Factual Background*

Defendant Edwin S. Lindsley, a lifelong resident of what is now the City of Virginia Beach, has been a self-titled "land salvor" for more than forty years. He describes his business as "assembling" real estate by purchasing property with defects in the chain of title and then clearing the title to make the property marketable. He then either develops the property or sells it at a profit. After acquiring the interest in property, Lindsley approaches persons who believe they are the true owners and tries to negotiate with them to purchase the remaining property interest. Sometimes the owners have sold the property to Lindsley; at other times, when the owners would not sell, he has filed partition suits asserting his interest in the property. Another method Lindsley uses to assemble property and clear titles is to revive defunct corporations and obtain deeds from their receivers or from remaining stockholders of those corporations whom he locates. After recording the deeds and paying taxes on the property, Lindsley again approaches the purported owners in an attempt to purchase the remaining property interest. If the owners would not sell, he would file suit. Lindsley has normally filed his suits in the court for the jurisdiction in which the land was located. While working as a "land salvor," Lindsley has examined titles to over 300 pieces of property, spending a considerable amount of time in the record room at Princess Anne in the City of Virginia Beach. He has reviewed deed books, map books, plat books, and records, and prepared a number of deeds while assembling property. He also has researched records in the Virginia State Library in

Richmond. In sum, Lindsley is skilled in the tasks of searching title to real estate, as well as preparing and recording deeds to real estate.

The Virginia Beach Circuit Court appointed William L. Parker in 1964 as receiver for Soames Corporation, pursuant to a petition filed by the Soames shareholders, to take charge of and liquidate its assets. In their petition, the Soames shareholders stated that, "The sole remaining asserts of the corporation consist of unimproved lots in the City of Virginia Beach. . . . Your petitioners allege that the value of the assets of said corporation will not exceed the sum of $5,000.00." When it appointed Parker receiver, the Virginia Beach Circuit Court referred the cause to P. W. Ackiss,[1] Commissioner in Chancery, to "inquire and report to the Court (1) a list of all property owned by Soames Corporation together with a description thereof." The Commissioner, based on Parker's title search, determined that the only real property interests remaining in Soames were three unimproved lots, none of which fronted on the Atlantic Ocean. Parker was authorized to convey the three lots in August 1965. In Parker's first report, he stated that he had received offers for each of the three lots and recommended to the Commissioner that the offers be accepted and the property conveyed to the offerors. On August 20, 1965, the Virginia Beach Circuit Court issued a decree confirming the Report of the Commissioner in Chancery and directed Parker to convey the three lots to the offerors. As a result, Soames Corporation no longer had any real property interests.

Parker issued a second report in 1969, in which he stated that before conveying the three unimproved lots to the offerors, he received an offer in writing from Mrs. Louise E. Baker to pay $3,000 for property interests described as:

> [A]ll remaining land, or interest in land, owned by Soames Corporation . . . situated in the City of Virginia Beach, Virginia, which was acquired by Soames Corporation by deed of Virginia Beach Realty Corporation, dated February 17, 1932, and duly recorded in the Clerk's Office of the Circuit Court of Princess Anne County, Virginia, now the City of Virginia Beach, not heretofore conveyed by Soames Corporation, or by William L. Parker, its Receiver, by deeds of record in the Clerk's Office aforesaid.

Parker reported that he told Mrs. Baker that he believed that "Soames Corporation did not have title to any land" and that Mrs. Baker "stated that she

---

[1] Mr. Ackiss later became a judge of that court.

was willing to accept a deed conveying whatever interest the corporation might have, if any." Parker recommended that Mrs. Baker's offer be accepted and that he be directed to execute and deliver a deed with special warranty conveying the described interest, if any. The Virginia Beach Circuit Court approved execution of this deed from Parker to Mrs. Baker on June 9, 1969.

Mrs. Louise E. Baker was a friend of Lindsley and his brother, Robert S. Lindsley, with whom Lindsley had worked during and after the time of the Soames receivership proceeding. Lindsley had researched title back approximately sixty or seventy years to determine if Soames Corporation owned land that it had not previously conveyed. Lindsley gave Mrs. Baker the $3,000, on behalf of his brother, to obtain the June 9, 1969, deed from Parker. When Mrs. Baker obtained the deed from Parker, Lindsley knew that the City of Virginia Beach had constructed a concrete boardwalk on the sandy beaches, that lifeguards were present on the same beaches, and that the Virginia Beach Erosion Commission had been replacing sand on the beach since 1953.

On June 12, 1969, Mrs. Baker gave a deed with the same property description to Defendant Lindsley's brother, Robert S. Lindsley. On September 17, 1990, after Robert S. Lindsley's sudden death, his widow, June M. Lindsley, gave a deed with the same property description to Defendant Fala. Fala is a corporation whose sole shareholder, officer, and director is Defendant Lindsley. On November 1, 1990, Fala gave a deed to Defendant Cobo Corporation (another corporation wholly owned and operated by Lindsley) containing the same property description. On August 29, 1991, Cobo gave a deed directly to Defendant Lindsley; however, this deed described the property as:

> All of that parcel of property, together with all accretions and additions thereto, lying, situate and being located in the Virginia Beach Borough in the City of Virginia Beach, Virginia, and being more particularly bounded and described as that parcel of property bounded on the north by the southern right of way line of Cavalier Drive, bounded on the south by the southern right of way line of First Street, bounded on the east by the mean low water mark of the Atlantic Ocean and bounded on the west by the western right of way line of Ocean Avenue (also known as Atlantic Boulevard).

This deed does not reference the February 17, 1932, deed from Virginia Beach Realty Corporation to Soames, but instead references a map entitled "Virginia Beach owned by Norfolk and Virginia Beach Railroad and Improvement Company." This deed also states that this property interest was an interest in

part of the property conveyed from Fala to Cobo in the November 1, 1990, deed.

On October 15, 1992, Cobo gave Fala a deed referencing both the November 1, 1990, deed from Fala to Cobo, and the September 12, 1990, deed from Robert S. Lindsley's widow to Fala. Cobo thus conveyed the same property to Fala that it had already conveyed to Lindsley. This deed contained yet another description of the same property:

> All those parcels of land and/or land covered by water located in the eastern portion of the Virginia Beach Borough in the City of Virginia Beach, Virginia, and being more particularly bounded and described as the land and/or land covered by water which is bounded on the east by the mean low waters of the Atlantic Ocean and bounded on the south by the extension in an easterly direction of the south right of way line of First Street and bounded on the west by the eastern boundary line of the platted lots and bounded on the north by the extension in an easterly direction of the south right of way line of 42nd Street (also known as Cavalier Drive).

On November 30, 1992, Cobo and Lindsley as grantors executed a deed to Fala for the property as described in the October 15, 1992, deed. This deed, self-described as a "deed of gift and correction," also purported to trace the chain of title, including the following deeds:

1. Deed from June M. Lindsley to Fala Corporation, September 12, 1990.
2. Deed from Louise E. Baker to Robert S. Lindsley, June 12, 1969.
3. Deed from William L. Parker, receiver for Soames Corporation, to Louise E. Baker, June 9, 1969.
4. Deed from Louise E. Baker to Robert S. Lindsley, May 1, 1969.
5. Deed from William L. Parker, receiver for Soames Corporation to Louise E. Baker, April 21, 1969.
6. Deed from Virginia Beach Realty Company to Soames Corporation, February 17, 1932.
7. Deed from Virginia Beach Syndicate to Virginia Beach Realty Company, May 15, 1923.
8. Deed from Virginia [Beach] Development Corporation to Virginia Beach Syndicate, November 15, 1920.
9. Deed from A. N. Chandler et ux. to Virginia Beach Development Corporation, July 25, 1900.

10. Deed from Norfolk and Virginia Beach Railroad and Improvement Company to A. N. Chandler et ux., July 23, 1900.

11. Deed from the Seaside Hotel and Land Company to Norfolk and Virginia Beach Railroad and Improvement Company, August 15, 1883.

On December 31, 1992, Fala conveyed property with the description in the October 15, 1992, deed to Defendant Lindsley by deed of exchange. This deed also purported to convey the land "together with any improvements thereupon," a provision not seen in the preceding deeds. The deed referenced the October 15, 1992, deed that conveyed the described property from Cobo to Fala. This deed does not, however, refer to the November 30, 1992, deed and its purported chain of title.

On May 11, 1994, Lindsley conveyed an undivided 16.66% interest in the property to Windsor Investors, Ltd. Windsor Investors, Ltd., was later renamed Nala Corporation on July 26, 1994. The deed contained the same property description as referenced in the December 31, 1992, deed from Fala to Lindsley. On January 10, 1995, these deeds showed Lindsley owning a 83.84% interest and Nala a 16.6% interest in property that purported to include the sandy beaches, seawall, and ends of the numbered street ends of the main resort area of Virginia Beach.

After the 1995 receivership proceeding, Lindsley made further dispositions of the property described in the December 31, 1992, deed from Fala to Lindsley as follows: (1) Lindsley conveyed another 8.33 percent interest to Nala by deed on March 15, 1995, although he described the north boundary as the "extension in an easterly direction of the south right of way line of 40th Street," instead of 42nd Street as in the earlier deeds; (2) Lindsley conveyed another 24.99 percent interest to Nala by deed on March 21, 1995, with the same description as the March 15, 1995, deed; (3) Lindsley conveyed another 50.02 percent interest to Nala by deed on April 4, 1995, with the same description as the March 15, 1995, deed. Thus, as of April 4, 1995, three months after the 1995 receivership proceeding, Nala had 100% of the interest in the described property.

Lindsley hired George N. Byrd, Jr., in 1994 to perform a title search on the real property in Virginia Beach between 5th Street and Rudee Inlet, formerly owned by the Virginia Beach Holding Corporation, a defunct Virginia corporation that was chartered on December 15, 1910, and dissolved by operation of law on June 1, 1933. In a "To Whom it May Concern" letter dated December 22, 1999, Byrd wrote that he had traced the property back to a deed recorded in 1910 from B. A. Banks, Special Commissioner. Byrd later testified that he had actually traced the property to an 1842 deed to Alexander

Hall, but he did not include that information in his December 1994 letter. The 1842 deed to Alexander Hall was the basis for the 1900 lawsuit leading to the 1904 jury verdict in *Hall v. Cason*, which divested Virginia Beach Development Corporation of its interest in the land south of 5th Street to Rudee Inlet.

In 1900, property owner William H. Hall filed an action in ejectment against Walter W. Cason and others, including the Norfolk and Southern Railroad Company, successor-in-interest to the Norfolk and Virginia Beach Rail and Improvement Company ("Improvement Company") and predecessor-in-interest to the Virginia Beach Development Company ("Development Company"). Hall alleged that, as of 1895, he was the owner in fee simple of a tract of land adjoining the Atlantic Ocean known as Rudee. Hall alleged that this land, which extended on a diagonal from the approximate location of 5th Street and Ocean Avenue, southwesterly to Rudee Inlet, had been part of the conveyance from Moses and Rebecca Henley to Hall's father, Alexander M. Hall, on January 1, 1842. In 1904, a jury awarded Hall possession of the land with its boundaries shown on a court-ordered survey by E. E. Burroughs, the County Surveyor ("Burroughs Survey"). The verdict stated that Hall's property right extended to the high water mark and divested the Norfolk and Southern Railroad Company, and, therefore, its successors-in-title, of any interest in oceanfront property it held between Rudee Inlet and 5th Street. Improvement Company, (and later, its successor-in-title, Development Company), with no remaining interest in any oceanfront lots or blocks on the shore south of 5th Street, never platted or sold any lots south of 5th Street. All subsequent development in the vicinity south of 5th Street was made by Virginia Beach Holding, as successor-in-title to Hall.

Lindsley had also researched title information regarding Virginia Beach Holding properties back to 1880. He further researched documents in Virginia Beach Holding's chain of title and reviewed the corporation's May 1925 partial plat with Byrd in 1994. Lindsley, an able and accomplished title examiner, knew that there was no reservation of the fee in the streets, or of riparian or littoral rights indicated on the partial plat.

On May 31, 1994, Lindsley asked his attorney, Harold Barnes, Esq.,[2] to write to the Army Corps of Engineers requesting the Corps to require the City of Virginia Beach to prove that it had marketable title to the beach property. This property was the site of a planned Corps-directed hurricane protection project. Lindsley wanted the City to pay him money as compensation for property Lindsley allegedly owned on the beach before the project began.

---

[2] Mr. Barnes also represents Lindsley in the case at bar.

Lindsley next hired a different attorney, George H. Heilig, Jr., Esq., to file a petition, Norfolk Circuit Court Chancery No. 95-73, in the Norfolk Circuit Court, with Nala as sole petitioner, to appoint a receiver for Virginia Beach Holding. Lindsley, through his attorney, asserted that the property owned by Virginia Beach Holding constituted a "cloud" on title to property that Lindsley purportedly owned. At that time, Lindsley knew of the verdict in *Hall v. Cason,* and he wanted a "correction deed" to correct his purported title as a result of that suit. *This was the first time that Lindsley had filed suit in a court for a jurisdiction other than that in which the land at issue was located.* Heilig was in failing health at the time and was almost blind. Lindsley told Heilig that Nala was the owner of record and had interest in certain lands described in the May 11, 1994, deed. Lindsley provided Heilig with the deeds, books, plat numbers, and background information and wrote or contributed to the writing of the petition and order, including the property descriptions. No evidence was presented indicating that Heilig performed any research himself prior to the 1995 Receivership Proceeding.

*1995 Receivership Proceeding*

On January 10, 1995, Heilig wrote to the Norfolk Circuit Court requesting a receiver be appointed for Virginia Beach Holding to remove a "cloud" on the title to real property allegedly owned by Nala.

> You will recall that several months ago you approved a petition and entered an Order appointing Jack D. Maness as a Special Receiver for Virginia Beach Annex Corporation to remove a cloud on title to certain property owned by the Corporation. We now have the same situation existing for Virginia Beach Holding Corporation and in this connection I enclose a copy of the Petition and an Order for your review, both of which are similar to the earlier petition and order.

Enclosed with this letter was a petition and a proposed order Heilig had prepared with Lindsley's assistance. Nala claimed in the petition that it was "the successor in title to a substantial portion of the remainder of the above-described 1200 acres owned by the . . . Development Company which included all of the above-described unplatted parcels." Nala described 1200 acres purportedly owned by the Virginia Beach Development Company as:

> 1200 acres of land running southwardly from the lands of the Peete heirs on the north along the mean low waterline of the waters of the

Atlantic Ocean, which mean low waterline follows the east boundary line of the aforesaid 1200 acres, to the centerline of Rudee Inlet on the south and which 1200 acres is described in the deed from Chandler & Company to the Virginia Beach Development Company dated July 29, 1900, and which deed is recorded in Deed Book 69 at page 493 in the aforesaid Clerk's Office and which 1200 acres is shown in the aforesaid Clerk's Office in Map Book 1 at page 23A, B.

In his letter, Heilig also requested an opportunity to appear before the Court on January 13, 1995, along with Byrd, to present the Petition and proposed Order. Byrd would be present to answer any title questions. The Clerk of the Norfolk Circuit Court received and filed the letter, petition, and order on January 13, 1995. None of the deeds or plats referenced in the petition were attached. The Court held a twenty to thirty minute *ex parte* hearing on January 13, 1995, attended by Heilig and Byrd. At the hearing this Court entered the order directing the court-appointed receiver, Jack Maness, Esq., to execute a deed to Nala for the "unplatted parcels" the petition described as an area east of the platted lots from 5th Street to Rudee Inlet and an area south of the platted lots, purportedly owned by Virginia Beach Holding. Maness gave Lindsley a Receiver's Deed that conveyed four parcels comprising the southern half of 5th Street, 4th Street, 3rd Street, and 2nd Street, east from the paved areas of those streets, through the concrete boardwalk and seawall, across the sandy public beach, to the mean low water mark of the Atlantic Ocean ("Street Extension Parcels"). These parcels are approximately 50 to 60 feet wide and 250 to 300 feet long, depending on the season of the year. Although Lindsley testified that he thought his personal checks to the receiver totaling $1,500 were both for the property and for the receiver's services, the receiver reported that, "[N]o money came into the receiver's hands as receiver." The Court finds that Lindsley paid nothing for the parcels and, furthermore, that he never intended to pay anything for them. Nala conveyed the parcels to Fala by deed dated December 28, 1995. Fala conveyed the parcels to Kana on February 19, 1997.

*Court of Claims Action*

On April 14, 1998, Defendants Fala and Kana filed a complaint in the United States Court of Federal Claims, alleging that the United States, through the Army Corps of Engineers, had constructed a seawall and placed beach fill material on the street extension parcels that Fala and Kana claimed to have owned since 1995. Fala and Kana contended that the Corps' actions

constituted a taking of the parcels without just compensation, and they demanded $3,740,000 from the United States for the alleged taking. Fala and Kana relied solely on the 1995 Receiver's Deed as the source of title to the parcels.

The City of Virginia Beach intervened as defendant in the Court of Claims action over Fala and Kana's objection, and it filed a motion to dismiss for lack of subject matter jurisdiction. Fala and Kana then filed a motion asking the Court of Claims to stay the present proceedings in this Court pending the outcome of the Court of Claims just compensation action. On July 8, 1999, the Court of Claims denied both the City's motion to dismiss and Fala and Kana's motion to stay the present proceedings. *Fala Corp. et al v. United States and City of Virginia Beach,* United States Court of Federal Claims, Civil Action No. 98-cv-337L. The City then filed a motion asking the Court of Claims to stay its own proceedings pending this Court's action with respect to the Receiver's Deed's validity, and that motion was granted on October 14, 1999.

## The Present Action

The City of Virginia Beach commenced this suit with a Bill of Complaint filed on March 12, 1999, because Fala's and Kana's claim of ownership in the Court of Claims action prompted the City to seek a determination of the Defendants' ownership. The Bill of Complaint named Nala, Fala, Kana, and Lindsley as Defendants, and in it the City petitioned the Court to vacate and declare null and void the January 13, 1995, order appointing Maness receiver for Virginia Beach Holding. The Defendants then removed the present suit to the United States District Court for the Eastern District of Virginia, Norfolk Division, and they urged that court to transfer venue to the Court of Claims. The District Court denied the motion to transfer it and remanded the case to this Court on June 21, 1999. The Defendants' demurrer to the Bill of Complaint was overruled, and the cause proceeded to trial on July 13, 2000.

## Discussion

Virginia law allows collateral attacks on a judgment or decree if it has been entered by a court that did not have jurisdiction over the subject matter or the parties, *Evans v. Smyth-Wythe Airport Commission,* 255 Va. 69, 73, 495 S.E.2d 825, 828 (1988), or procured by fraud on the court. Va. Code Ann. § 8.01-428(D); *Gulfstream Bldg. Assocs. v. Brill,* 239 Va. 178, 387 S.E.2d

488 (1990). Such a judgment is void *ab initio* and confers no rights or obligations on the parties. *Evans*, 225 Va. at 74, 495 S.E.2d at 828.

## Standing

The Defendants initially assert that the City lacks standing to maintain this collateral challenge to the 1995 receivership proceeding. A non-party may, however, maintain an independent action under § 8.01-428(D) for relief from a judgment or decree allegedly procured by fraud on the court if the non-party had an interest that is jeopardized by that prior judgment or decree. *Gulfstream Bldg. Assocs. v. Brill*, 239 Va. 178, 182, 387 S.E.2d 488, 490 (1990) (citing *Wilcher v. Robertson*, 78 Va. 602, 617 (1884)). The courts in both *Gulfstream* and *Wilcher* evaluated non-party fee simple interests but did not restrict standing to maintain suits under § 8.01-428(D) and prior law to such interests.

In the instant case, the Court holds that whether the City's interest is that of fee simple ownership, easement holder by dedication, or some other interest is of no consequence. The City has standing to maintain this action for two reasons: first, by virtue of its longstanding maintenance and supervision of the oceanfront beaches at issue, including construction of the boardwalk and seawall, and second, because of the Supreme Court of Virginia's holding in *Greenco Corp. v. City of Virginia Beach*, 214 Va. 201, 198 S.E.2d 496 (1973), that Ocean Avenue (also called Atlantic Boulevard) was dedicated to the public "as a seashore recreational area for the benefit of the public generally and the owners of the lots shown on the plat." Ocean Avenue/Atlantic Boulevard is a paper street consisting of a grassy strip and open space, located immediately to the east of all of the easternmost platted lots from 40th Street to Rudee Inlet between the platted lots and the seashore. The City thus had sufficient interest in the outcome of the 1995 receivership proceedings to be prejudiced by its result, thus satisfying the tests for standing in *Gulfstream* and *Wilcher*.

## Subject Matter Jurisdiction

The plaintiff's assertion that the Court lacked subject matter jurisdiction over the receivership proceeding is without merit. Virginia Code § 8.01-591 provides:

Whenever the pleadings in any suit make out a proper case for the appointment of a receiver and application is made therefor to any

court, such court shall designate the time and place for hearing such application, and shall require reasonable notice thereof to be given to the defendant and to all other parties having a substantial interest, either as owners of or lienors of record and lienors known to the plaintiff, in the subject matter. The court to whom such application is made shall inquire particularly of the applicant as to the parties so substantially interested in the subject matter, and such applicant for any intentional or willful failure to disclose fully all material information relating to such inquiry, may be adjudged to be in contempt of court.

Virginia Beach Holding Corporation's last principal place of business was in the City of Norfolk, and venue was certainly proper here. The plaintiff's reading of this statute to require a collateral suit or action to be pending upon which to base the appointment of a receiver is mistaken. Receivers of defunct corporations are frequently appointed to give deeds to clarify matters of record or to release restrictive covenants which are no longer enforceable or necessary. The pleadings to which the statute refers can certainly be those of a collateral suit or action; they can also be the pleadings filed in a suit seeking the appointment of a receiver.

Next, the plaintiff asserts that the order appointing the receiver must be declared a nullity because the proceeding was not conducted according to law. The City bases this conclusion on the absence of documentary evidence in the file and upon the belief that no witnesses were sworn. There was no record of the hearing in the receivership proceeding and one of the three participants in that hearing is now deceased. The judge presiding over the case at bar also presided over the receivership hearing. At that hearing, the title examiner's letter was considered, and that letter is in the court's file initialed by the judge. It was considered at the hearing. The title examiner also exhibited a partial plat of the area. The judge specifically asked counsel if any other parties would be affected by the appointment of the receiver as required by statute. The response was in the negative. While the hearing may not have been conducted in an ideal fashion, it was sufficient.

### Fraud

Nala and Lindsley made numerous material misrepresentations to the Court through their attorney's letter, petition, and order, and during the 1995 receivership proceeding. They intentionally failed to disclose material facts, thus inducing the Court to enter the Order appointing a receiver for Virginia

Beach Holding and directing the receiver to execute a deed to convey property to Nala.

A plaintiff challenging a judgment because of fraud must show the existence of extrinsic, rather than intrinsic fraud. "Intrinsic fraud includes perjury, use of forged documents, or other means of obscuring facts presented before the court and whose truth or falsity as to the issues being litigated are passed upon by the trier of fact." *Peet v. Peet*, 16 Va. App. 323, 326 (1993). Courts generally do not allow collateral attacks when a party alleges intrinsic fraud because normally the parties at trial have the opportunity through cross-examination and impeachment to expose false information. Thus parties usually must proceed via direct attack within twenty-one days of judgment rather than wait and attack the judgment collaterally. *Id.* (citing *Jones v. Willard*, 224 Va. 602, 607, 299 S.E.2d 504, 508 (1983)).

Conversely, extrinsic fraud consists of "conduct which prevents a fair submission of the controversy to the court" and, therefore, renders the results of the proceeding null and void." *Id.* Courts allow collateral challenges to judgments or decrees obtained by extrinsic fraud "because such fraud perverts the judicial processes and prevents the court or non-defrauding party from discovering the fraud through the regular adversarial process." *Id.*

The Virginia Supreme Court noted in 1992 that, "[f]ew courts have discussed the factors that must be proven when deciding whether a fraud has been committed upon a court. A controlling factor, however, is "whether the misconduct tampers with the judicial machinery and subverts the integrity of the court itself." *Owens-Corning Fiberglas Corp. v. Watson*, 243 Va. 128, 142, 413 S.E.2d 630, 638 (1992). The party alleging fraud has the burden to prove the following elements by clear and convincing evidence: (1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled. *Van Deusen v. Snead*, 247 Va. 324, 327, 441 S.E.2d 207, 209 (1994). These elements apply with equal force whether the party misled is a party to a transaction or the court itself, particularly in an *ex parte*, nonadversarial proceeding. The "resulting damage" is the prevention of a fair submission to the court and the resulting undermining of the court's integrity.

### Concealing True Party in Interest from the Court

Nala and Lindsley deliberately and knowingly concealed from the Court the true party in interest in the 1995 receivership proceeding. The 1995 petition and order falsely stated that Nala was the owner of the alleged interest

in land when, in fact, Lindsley owned 83.84% of the alleged interest and Nala only owned 16.16%. Lindsley's involvement was totally hidden; he was, in fact, the puppeteer for all of the actors who appeared before the Court.

The 1995 petition, brought solely in Nala's name, stated that, "The aforesaid Nala Corporation, a Virginia corporation, is the successor-in-title to a substantial portion of the remainder of the above-described 1200 acres . . . ." The order states, "And it appearing to the Court, upon competent evidence, that the petitioner, Nala Corporation, a Virginia Corporation, is the owner of record and has an interest in certain lands located in the City of Virginia Beach . . . and conveyed to the said petitioner [Nala] by deed dated May 11, 1994 . . . ." The petition and order, prepared by Heilig and based on information Lindsley provided, materially misrepresented the extent of Nala's interest in the property at issue. Lindsley conveyed the rest of his interest in increments during the three months after the receivership proceeding ended with Nala obtaining the receiver's deed. Nala did not, at least on paper, have a "substantial interest" in anything, including the disputed property, until April 4, 1995, three months after the receivership proceeding.

The defendants in *Van Deusen* contended, as do defendants here, that "the only type of misrepresentation contemplated by the definition of fraud is an intentional, express verbalization of a falsehood." *Id*. The Supreme Court of Virginia in *Van Deusen*, however, held that, "For purposes of an action for fraud, concealment, whether accompanied by word or conduct, may be the equivalent of a false representation, because concealment always involves deliberate nondisclosure designed to prevent another from learning the truth." *Id*. Although in *Van Deusen*, the material facts were concealed from the other party *and* the court, the principle has the same effect when applied in an *ex parte* proceeding where the facts have been concealed only from the court. In such a nonadversarial proceeding, the court is equivalent to "another party" in a contractual setting. This principle is consistent with the concept of extrinsic fraud because such concealment prevents a fair submission of a matter to the court. This Court finds, then, by clear and convincing evidence, that Nala and Lindsley deliberately and knowingly concealed the true party in interest in the 1995 receivership proceeding from this Court because the 1995 petition and order falsely stated that Nala was the owner of the alleged interest in land when, in fact, Lindsley owned 83.84% of the alleged interest and Nala only owned 16.16%.

*Material False Statements Regarding Nala's Ownership Claims*

In the petition in the 1995 receivership proceeding, Nala asserted that it was "the successor in title to a substantial portion of the above described 1200 acres owned by the aforesaid Virginia Beach Development Company which included all of the above-described unplatted parcels." This statement is clearly false because Nala was not at *any* time a successor-in-title to *any* portion of the remainder of the 1200 acres formerly owned by Virginia Beach Development. Both Nala and Lindsley knew this allegation to be false when it was made, and at trial, the defendants did not even attempt to produce evidence to substantiate their claim to this property.

Nala's petition referred to Map Book 1, pages 23A and B, more commonly known as the "R. M. Hughes Map." The Norfolk and Virginia Beach Rail and Improvement Company, in 1887, recorded this first developer's plat laying out the Town of Virginia Beach. The Improvement Company was the successor-in-interest to the oceanfront's original developer, Seaside Hotel and Land Company, and it sold many lots by reference to the Hughes Map. Seaside was a corporation chartered in the City of Norfolk on September 18, 1880. Seaside's purpose was to amass parcels of land along the Atlantic Ocean and develop a "seaside watering place," with authority to build hotels, cottages, and make improvements to the beachfront property. Significantly, Seaside's charter expressly stated that:

> [N]othing herein contained shall be construed as granting to the said Company any power to hold any of the lands on the said Sea Shore which by the Acts of May seventeen hundred and eighty and eighteen hundred and two reserved as a Common to all the people of this state.

The concept of the "commons" will be discussed in detail later in this opinion. Further, on March 6, 1906, the Town of Virginia Beach was incorporated by an Act of Assembly that referenced the Hughes Map. The Improvement Company was later renamed the Norfolk and Virginia Beach and Southern Railroad Company, and later, the Norfolk and Southern Railroad Company.

The Development Company, cited in Nala's 1995 petition as the purported source of its title in the "unplatted parcels," acquired all of the Improvement Company's remaining property and recorded its own plat in 1900. It later acquired additional property that it also platted and then rapidly sold its holdings by reference to these plats.

The six original Development Company plats divided into lots and streets the current Virginia Beach resort area from 40th Street south to Rudee Inlet,

and west from the ocean shoreline to the Lakehorn Creek and Lake Christine tributaries. The Development Company's land's easternmost boundary ran "along the coast" of the Atlantic Ocean. The eastern boundaries of the platted lots were the same as those on the Hughes Map, on which they are shown bounding a grassy strip and open space, designated as "Ocean Avenue," a public way between the easternmost platted lots and the seashore. The 1900 Development Company plat was recorded in 1901 and it did not conflict with, nor was intended to replace the Hughes Map. This plat lacked detail south of 8th Street, and although the words "Ocean Avenue" do not appear on the plat, the avenue's location and seashore width are clearly shown. The Virginia Supreme Court in *Greenco Corp. v. City of Virginia Beach*, 214 Va. 201, 198 S.E.2d 496 (1973), held that Ocean Avenue was dedicated to the public "as a seashore recreational area for the benefit of the public generally and the owners of the lots shown on the plat" in 1900 when Development Company recorded its plat. *Id.* The court held further that "the offer of dedication had been accepted by the public and by acts of the appropriate governing authority." *Id.*

In 1904, the Development Company was divested of any interest in oceanfront property south of 5th Street as the result of the jury verdict in *Hall v. Cason*. The Development Company sold its remaining property interests, which no longer included oceanfront property south of 5th Street, to the Virginia Beach Syndicate on July 14, 1921. With that action, all of the Development Company's oceanfront lots had been conveyed. Neither the Development Company nor any of its successors-in-title reserved or severed riparian rights or reserved the fee in the streets shown on their oceanfront plats. These remaining property interests north of 5th Street were conveyed from Syndicate to Virginia Beach Realty Corporation on May 15, 1923, and from Virginia Beach Realty Corporation to Soames Corporation on February 17, 1932. Soames thus could not, and did not, at any time, own oceanfront property south of 5th Street.

This chain of title demonstrates that the 1904 verdict in *Hall v. Cason* totally divested Virginia Beach Development Company and its successors-in-interest, including Soames, of *any* interest in oceanfront property south of 5th Street. Parker, the Soames receiver, correctly told Mrs. Baker that there were no real property interests left in Soames to convey because all of the 1200 acres still above water had already been conveyed by Soames and its predecessors-in-title. The Soames Commissioner correctly affirmed that statement. The Court finds by clear and convincing evidence that Lindsley and Nala knew that the deed from Soames to Mrs. Baker conveyed nothing and that they intentionally failed to advise the Court of this fact.

*Material False Statements Regarding "Cloud" on Nala's Title*

The late George H. Heilig, Jr., Esq., Lindsley's attorney, prepared a letter to the Court on January 10, 1995, at Lindsley's request stating:

> You will recall that several months ago you approved a petition and entered an Order appointing [Maness] as a Special Receiver for Virginia Beach Annex Corporation to remove a *cloud on the title* for certain property owned by the Corporation. We now have the same situation existing for Virginia Beach Holding Corporation and in this connection I enclose a copy of the Petition and an Order for your review, both of which are similar to the earlier petition and order.

(Emphasis added.)

The order Heilig prepared was based on information Lindsley had given him, stating the reason for appointing the receiver:

> [T]o convey by his deed certain real estate to the Petitioner [Nala] in order to remove a cloud from the title of property now titled in the Petitioner [Nala] . . . it appearing to the Court, upon competent evidence, that the Petitioner, Nala . . . is the owner of record and has an interest in certain lands located in the City of Virginia Beach, Virginia, owned by the Virginia Beach Holding Corporation . . . .

(Emphasis added.)

Both of these documents included false and misleading material facts. Lindsley and Nala knew that neither Lindsley, Nala, nor any of Lindsley's other shell corporations had any interest in Virginia Beach Holding's oceanfront property.[3] As a result of *Hall v. Cason*, Virginia Beach Holding, as successor-in-title to William S. Hall, had possessed the property south of 5th Street, and these lands could not possibly constitute a "cloud" on Nala's title to any property purportedly acquired from Parker, the Soames receiver.

The *Hall* suit, and its effect on oceanfront development, is a matter of public record and is otherwise well-known. The Act of Incorporation for the City of Virginia Beach of March 6, 1906, defines the City's southern

---

[3] Lindsley employed Byrd to search the title of Virginia Beach Holding and Byrd testified in the instant case that Virginia Beach Development Company had no interest south of 5th Street as the result of *Hall v. Cason*. He was not a knowing participant in Lindsley's fraud.

boundary as "Hall's Line." This was the southern boundary of Hall's property and bordering the lands of Chautauqua-by-the-Sea Assembly, as determined in the *Hall* suit. The Burroughs Survey is recorded in Map Book 1 at page 16 in the City's Clerk's Office; both the Burroughs Survey and the *Hall v. Cason* judgment itself are explicitly cited in the deed into Virginia Beach Holding, recorded in Deed Book 85 at page 476, and the deed to its predecessor-in-title, Virginia Beach Land Company, recorded in Deed Book 79 at page 467.

Lindsley and Byrd were aware of the *Hall* suit. Lindsley was thus aware that there was no overlap of title between Virginia Beach Holding and Virginia Beach Development or any of its successors-in-title. Byrd's "to whom it may concern letter," filed with the petition, states, "I have run the property acquired by Virginia Beach Holding Corporation in Deed Book 85, page 475, dated December 23, 1910, from B. A. Banks . . . ." This deed describes the property being conveyed:

> With reference to a plat thereof made by E. E. Burroughs, County Surveyor of said County, referred to in a judgment of the Circuit Court of said County of Princess Anne rendered on the twenty-eighth (28th) day of July in the year of nineteen hundred and four (1904), and a certain action of ejectment wherein William H. Hall was Plaintiff and W. W. Cason et al. were Defendants . . . .

Although the deed incorporates both the *Hall* suit and the Burroughs survey by reference, neither Lindsley, Nala, nor Byrd ever informed this Court of the significance of those references to the issues in the 1995 receivership proceeding. Lindsley and Nala, instead, came before the court claiming to stand in the shoes of the successors-in-title to Development Company and contended that the property of Virginia Beach Holding clouded Nala's title acquired from the Soames receiver. The Court finds by clear and convincing evidence that Lindsley and Nala were thus making a knowing, intentional, and material misrepresentation to the court that an overlap existed between the two property interests, when in fact, there was no overlap, no conflict, and therefore no cloud on Nala's title. Had the Court known that neither Soames nor its predecessors-in-interest had any interest in this area of the oceanfront, the Court would have clearly realized the impossibility for any interest of Virginia Beach Holding to constitute a "cloud" on Nala's title.

*Material False Statements and Omissions Regarding "Unplatted Parcels"*

According to the 1995 petition and order, the property causing the alleged "cloud on title" to Nala's property, and that should be conveyed to Nala, consisted of "unplatted parcels" shown on the plat recorded in the Virginia Beach Clerk's Office in Map Book 7 at page 95 (the "Virginia Beach Holding Plat"). The petition falsely states that the Virginia Beach Holding Plat includes an "unplatted area" bounded on the west by the eastern boundary lines of the lots and blocks shown on it and the eastern boundary lines of 2nd, 3rd, 4th and the southern half of 5th Streets, also shown on the Plat. Nala asserted that the eastern boundary of the "unplatted area" is the mean low water line of the Atlantic Ocean. Neither the "unplatted area" nor the "unplatted parcels" exist, and Lindsley and Nala knew that they did not exist because both the Virginia Beach Holding deeds that were allegedly attached to the petition (but in actuality were not) and the Virginia Beach Holding Plat, to which the deeds and the petition both refer, clearly show the extent of Virginia Beach Holding's interest in the property shown on the Plat.

The Virginia Beach Holding Plat, which is not an actual survey, shows the approximate locations of numbered lots and lettered blocks as well as the general presence of the Atlantic Ocean, with the express caveat: "Traced from old map. Water lines approximate." According to deeds from Virginia Beach Holding, for every oceanfront lot shown on the Virginia Beach Holding Plat, the northern and southern boundary lines of the lots ran from Atlantic Avenue to the Atlantic Ocean. All lots were expressly conveyed with riparian rights and there is no mention in the deeds of the existence of any land between the lots and the Atlantic Ocean.

Nala further claims in the petition that the numbered streets on the Virginia Beach Holding Plat have eastern boundary lines. There is no evidence in the record to support such an allegation. The numbered streets were clearly intended to run to the eastern limits of Virginia Beach Holding's property to provide access for lot owners to the Atlantic Ocean without crossing the property of any of the oceanfront lot owners. Virginia Beach Holding developed both the upland as well as the oceanfront, and its plats for parcels west of Atlantic Avenue shows the same street access to the Atlantic Ocean as shown on the partial Virginia Beach Holding Plat for the disputed parcels, ensuring that upland property owners would have ample access to the seashore. A routine and objective title examination would reveal that Virginia Beach Holding never owned any land east of its platted lots, and thus there was no interest that a receiver could convey.

Virginia Beach Holding's title is derived from Hall, who owned these lands in the late 1800s and conveyed them in 1906. He instituted the *Hall* suit in 1900 to establish his property's boundary lines, shown on the Burroughs Survey. This survey shows Hall's easternmost boundary as the mean high water mark of the Atlantic Ocean. The court's final order in *Hall v. Cason* likewise fixed the easternmost boundary at this high water mark and established the total extent of the property that Hall could have conveyed to Virginia Beach Holding.

When Virginia Beach Holding created its plat, it placed the lots and blocks within the Burroughs Survey boundaries. Hall never claimed to own any property below the high water mark, and likewise, neither did Virginia Beach Holding. The property between the high and low water marks of the Atlantic Ocean comprise part of the "commons," belonging to the Commonwealth of Virginia.

A consideration of the ancient doctrine of "commons" or "common lands" is helpful in resolving the issue of ownership of the parcels in question. This doctrine was firmly embedded in the common law of England at the time of the settlement of Virginia, and the common law of England "insofar as it is not repugnant to the principles of the Bill of Rights and the Constitution of this Commonwealth" remains a vital part of Virginia law. Va. Code Ann. § 1-10.

At common law, the shores of the sea were held by the Crown:

> By the common law, both the title and the dominion of the sea, and of rivers and arms of the sea, where the tide ebbs and flows, and of all the lands below high water mark, within the jurisdiction of the Crown of England, are in the King.

*Shively v. Bowlby*, 152 U.S. 11 (1893).

The shores of the sea included the lands lying between the high water line and the low water line of the ocean. *Id.* Of course, the Crown had power to grant parcels to private persons; but unless such a grant were made, the people had the right to use these lands for the purposes of navigation, fishing, and fowling. These lands were included in that class of parcels of land called "common." Some examples of commons include land reserved for public roads and for common pasture. 2 William Blackstone, *Commentaries*, 90. Another type of land held as commons by the sovereign is of interest in the case at bar: the lands bordering upon tidal waters and lying between the high and low water lines. *Miller v. Commonwealth*, 159 Va. 924, 929, 166 S.E. 557 (1932). This opinion discusses the commons doctrine in great depth and is perhaps the seminal Virginia case on the subject.

Throughout the centuries the law presumed that the sovereign had not and, indeed, did not intend to include within the boundaries of a grant those lands lying between the high and low water lines:

> As the presumption was that the king had not granted, and did not intend to include within the limits of a grant made by him, lands lying between high and low-water marks, where the grant called for the sea, or a tidal bay, river or creek, as the boundary of the land granted, the boundary was, as a matter of law, construed to be high-water mark, unless the grant expressly or impliedly showed an intention to make the low-water mark the boundary called for. The presumption that the boundary was high-water mark was even stronger where the grant described the land as bounded by or on, or running along the shore, beach, or bank of the sea, bay, river, or creek.

*Id.* at 929-30, 166 S.E.2d at 557.

This holding is consistent with the teaching of the United States Supreme Court when it quoted with approval from Lord Chief Justice Hale's treatise, *De Jure Maris*:

> It is equally well settled that a grant from the sovereign of land bounded by the sea, or by any navigable tide water, does not pass any title below high water mark, unless either the language of the grant, or long usage under it, clearly indicates that such was the intention.

*Shively*, 152 U.S. at 13.

The court found, too, that this presumption had not eroded over time:

> We have examined a large number of the patents to land in Tidewater Virginia which were granted both before and after 1679; and we think that the conclusion is irresistible that, with comparatively few exceptions, the grantee so located the land to which he was entitled under his land "rights" as to give him the number of acres to which he was entitled above the high-water mark. Where this was done, it would seem to support effectively the presumption of the common law that the grant did not include within its limits the adjacent land lying between the high and low water marks.

*Miller*, 159 Va. at 936, 166 S.E. at 561.

Since lands included in a commons cannot be conveyed except by a grant from the sovereign, it is necessary to consider whether such a grant affecting the parcels at issue was ever made. During the colonial period, grants were made by the King or by another, such as the Royal Governor, who was empowered to exercise the King's authority. All the rights of the Crown and the English Parliament vested in the states, subject to the rights they surrendered to the Federal government upon the commencement of the American Revolution. *Johnson v. McIntosh*, 21 U.S. (8 Wheat.) 543 (1823).

No grants, patents, or other conveyances purporting to grant any interest in the commons along the Atlantic Ocean in what is now the City of Virginia Beach from the settlement of the Colony of Virginia until the present were introduced. Professor N. B. Theberge, who has held appointments at the College of William and Mary in its School of Marine Science, its Virginia Institute of Marine Science, and its Marshall-Wythe School of Law, performed extensive research into the rights of the public to the Atlantic Ocean beaches in Virginia Beach. His conclusion, which the Court adopts after considering all of the evidence presented found:

> Other than the one 1869 sale of the Cape Henry area, no other valid sale or grants of the seashore from the Commonwealth, by special grant or compact as required by the 1873 statute, were discovered along the Atlantic coast of what is now Virginia Beach. With the possible exception of the 1869 conveyance of the seashore in the Cape Henry tract, the results of this investigation indicate that the lands along the Atlantic coast in Virginia Beach are common lands and continue to be publicly owned today.[4]

Plaintiff's Exhibit 114, p. 4.

From the founding of the Colony of Virginia, the Privy Council, exercising the Crown's authority, specifically reserved land along the Atlantic coast for public use. This policy, except for a brief interlude from 1866 to 1871, has remained in effect until the present. In 1866 the General Assembly provided for the sale of the common lands in Virginia to raise funds for paying the war debt. To facilitate the sales, a survey of the common lands was begun, and the common lands bordering the Atlantic Ocean in Princess Anne County

---

[4] It is of interest to note that the Supreme Court evidently conducted extensive research into the status of commons in *Miller v. Commonwealth*, 159 Va. 924 (1932), and *Bradford v. Nature Conservancy*, 224 Va. 181 (1982). In neither case did the Supreme Court refer to any conveyance of commons land along the Atlantic coast in what is now the City of Virginia Beach.

(now the City of Virginia Beach) were the first to be surveyed. The survey showed common lands running along the Atlantic Ocean from Cape Henry southward to the North Carolina state line. These lands extended above the high water mark, including the beach, dunes, and, in some instances, land west of the dunes. The one sale of commons land in this area made during the period from 1866 to 1871 did not include the property at issue in this suit.[5] In *Miller*, the Supreme Court reached a significant and similar conclusion after its own exhaustive research:[6]

> Our conclusion is that comparatively few of the grants made by the London Company, the Crown, or the Commonwealth pass, *under the common law rules [sic]*, the title to land lying between high and low water marks.

*Miller*, 159 Va. at 936-37, 166 S.E. at 560. The defendants urge that in Virginia the property boundary of parcels bordering on the sea extend to the low water mark. This idea probably arose with a statute enacted by the General Assembly in 1819. For a discussion of this statute and its predecessor and successor statutes and their effect, see *Bradford v. Nature Conservancy, infra*. This act did extend the boundary of certain property to the low water mark, but this provision applied only to those parcels that can trace their title to a grant made prior to 1780. *Bradford v. Nature Conservancy*, 224 Va. 181, 197 (1982).

The Court finds, based upon the evidence presented, the authorities cited by counsel, and from the Court's own research, that no grant by any sovereign conveyed any parcel of the commons lying between the high and low water marks along the Atlantic Ocean in what is now the City of Virginia Beach within the limits of any of the lands formerly owned by Virginia Beach Development Co. or the lands formerly owned by Virginia Beach Holding. The lands owned by the Virginia Beach Development Co. to which the Court refers extend from 40th Street southward to Rudee Inlet and are shown on

---

[5] The property was "generally from Lynnhaven Inlet around Cape Henry to a point east of Crystal Lake." Plaintiff's Exhibit 114, p. 3.

[6] The *Miller* court explained: "We have forborne the citation of cases on this subject for the reason that our conclusions have been based upon a critical study of the principles which seem to underlie the cases upon this subject rather than upon the pronouncements contained in any one or more cases. The cases upon the subject are readily found by reference to the standard works on the subject; and it would add much to the length and nothing to the clarity of this opinion to enter upon a digest and discussion of them here." *Miller*, at 931.

Plaintiff's Exhibit 108. That exhibit is a compilation of plats of holdings of Virginia Beach Development Co. found in the Clerk's Office of the Circuit Court of the City of Virginia Beach as follows: Map Book 1, page 20; Map Book 3, pages 176-77; Map Book 4, page 125; Map Book 4, page 266; Map Book 5, page 21; and Map Book 5, page 103. It is not disputed that Virginia Beach Development Co.'s holdings at one time included the land in the City of Virginia Beach now lying between Rudee Inlet and 5th Street. The lands owned by Virginia Beach Holding to which the Court refers are shown on Plaintiff's Exhibit 11, Virginia Beach Holding's partial plat, Map Book 7, page 95.

Thus, even assuming, *arguendo*, that the appointment of the receiver for Virginia Beach Holding Co. in 1995 was valid, he was incapable of giving a valid deed to any of the lands lying between the high and low water marks because neither Virginia Beach Holding nor Virginia Beach Development ever owned such land, and therefore neither company nor a receiver for either of them could convey such land.

The Court finds that Lindsley and Nala knew that the total interest of Virginia Beach Holding ended at the eastern boundary of the platted lots, the mean high water line of the Atlantic Ocean, but chose to ignore that fact and instead provided their own interpretation of the Virginia Beach Holding's oceanfront property deeds:

> It would therefore appear that the intent of Virginia Beach Holding Corporation was to convey each of the above described lots only from the east right of way eastward for a distance of 150 feet to the eastern boundary line of each of the described lots as shown on the aforesaid plat which distance or 150 feet does not include the hereinafter described unplatted parcels . . . .

This statement of Virginia Beach Holding's "intent" was clearly false and, not only is it unsupported by any record title, it is contradicted by the record actually existing.

Assuming, *arguendo*, that Lindsley's unsupported interpretation of Virginia Beach Holding's deeds is correct and the eastern boundary of the platted lots is 150 feet from the east right of way of Atlantic Avenue, any property between such eastern boundary and mean high water was dedicated to the public as described in the Supreme Court of Virginia's holding in *Greenco Corp. v. City of Virginia Beach*, discussed previously in this opinion. Lindsley knew about the *Greenco* decision, but he and Nala failed to bring the case to the Court's attention or the fact that *Greenco* negated Nala's claim to

any oceanfront land south of 5th Street. The holding in *Greenco* was a material fact bearing on title to the property in question, and thus the Court finds that its omission was an intentional material misrepresentation under *Van Deusen*.

Lindsley and Nala also knew that the City and its governmental predecessors had constructed and maintained a concrete boardwalk and seawall and other improvements on the beach, including "connector parks" at the ends of 2nd, 3rd, 4th, and 5th Streets on the disputed property and failed to so inform the Court. Disclosing this material information would have immediately put the Court on notice of the property's public nature. Further, this information was also a material fact bearing on the property's title, and the Court finds that its omission was yet another intentional material misrepresentation under *Van Deusen*. The petition further describes one of the two "unplatted parcels" as "an unplatted area bounded on the north by the south boundary line of the aforesaid lot 9 in Block G . . . ." The petition describes land that, even if it existed, would lie entirely south of Virginia Beach Holding's southern boundary line. Virginia Beach Holding did not own this property for several reasons. First, it was south of the land surveyed and adjudicated as belonging to Virginia Beach Holding's predecessor-in-title, William H. Hall, as a result of *Hall v. Cason*. Second, the land was entirely under water as of the date of the 1995 receivership proceeding, because it was the mouth of the Rudee Inlet. Finally, the deed from Virginia Beach Holding to Evans for lot 9 in Block G, recorded in Deed Book 124, at page 353, describes the lot as:

> [B]eing irregular in shape, being Eighty-Five (85) feet, more or less, along the Atlantic ocean, bounded on the North by dividing lines between lots Number Eight (8) and Nine (9) in said Block G, on the West by Atlantic Avenue, extended, and on the South following the lines of the tract originally conveyed to the said Virginia Beach Holding Corporation by deed of B. A. Banks, Special Commissioner, recorded in deed book 85, at page 476, this lot being all the property of the Corporation south of lot Number Eight (8) and east of Atlantic Avenue . . . .

Therefore, from this deed's express language, there was clearly no "unplatted parcel south of lot 8 in block G" shown on the Virginia Beach Holding Plat.

*Concealment Regarding the Origin of Nala's Deed*

The Order from the 1995 receivership proceeding stated that petitioner Nala:

> [I]s the owner of record and has an interest in certain lands located in the City of Virginia Beach, Virginia, owned by the Virginia Beach Holding Corporation, a defunct Virginia corporation, and conveyed to the said petitioner by deed dated May 11, 1994, and duly recorded in the Deed Book 3445 at page 1773 in the Office of the Clerk of the Circuit Court of the City of Virginia Beach, Virginia.

The May 11, 1994, deed referenced in the Order stated that the source of Nala's title was the conveyance from Lindsley to Windsor (now Nala), containing the following description:

> All those parcels of land and/or land covered by water located in the eastern portion of the Virginia Beach Borough in the City of Virginia Beach, Virginia, together with any improvements thereupon, and being more particularly bounded and described as the land and/or land covered by water which is bounded on the east by the mean low water line of the Atlantic Ocean and bounded on the south by the extension in an easterly direction of the south right of way line of First Street and bounded on the west by the eastern boundary line of the platted lots and bounded on the north by the extension in an easterly direction of the south right of way line of 42nd Street (also known as Cavalier Drive) as shown on the "Map of Virginia Beach owned by Norfolk and Virginia Beach Railroad and Improvement Company" which map is recorded in the Office of the Circuit Court of the City of Virginia Beach, Virginia, in Map Book 1 at page 23-b . . . .[7]

---

[7] The May 11, 1994, deed was recorded in Deed Book 3391, at page 2177. This deed was re-recorded three times; the second time it was re-recorded on June 1, 1994, in Deed Book 3445 at page 1773 to "correct 42nd Street (also known as Cavalier Drive) to 40th Street."

The deed was re-recorded a third time on November 7, 1994, in Deed Book 3450 at page 180 to "correct 40th Street to be an extension in an easterly direction of the north right of way line of 40th Street."

As already described in this opinion, the deed from Parker, the Soames receiver, to Mrs. Baker, actually conveyed no property interest, as Soames had no remaining property interest to convey. Lindsley knew this to be the case. That deed contained very general information:

> [A]ll remaining land, or interest in land, owned by Soames Corporation ... situated in the City of Virginia Beach, Virginia, which was acquired by Soames Corporation by deed of Virginia Beach Realty Corporation, dated February 17, 1932, and duly recorded in the Clerk's Office of the Circuit Court of Princess Anne County, Virginia, now the City of Virginia Beach, not heretofore conveyed by Soames Corporation, or by William L. Parker, its Receiver, by deeds of record in the Clerk's Office aforesaid.

After Fala, one of Lindsley's wholly-owned shell corporations, received its deed from Lindsley's brother's widow in November 1990, Lindsley conveyed the non-existent Soames property interest several times between himself and his other shell corporations, Cobo, Windsor, and Nala. Lindsley created and signed these deeds, changing the property description several times as these deeds traveled among Lindsley and his shell corporations, culminating in the May 11, 1994, deed that purportedly conveyed the entire Virginia Beach oceanfront. The defendants presented no evidence at trial supporting claims to ownership of the parcels as described in these deeds. The Court finds by clear and convincing evidence that because the June 9, 1969, deed from Parker to Mrs. Baker conveyed no property interest, (1) any subsequent deed based on the June 9, 1969, deed also conveyed no property interest, and (2) the property descriptions in such subsequent deeds, beginning with the August 29, 1991, deed from Cobo to Lindsley, were false and misleading, intentionally created by Lindsley in an attempt fraudulently to claim ownership of the property described therein. Such property includes the Virginia Beach resort area's sandy beaches and the improvements thereon, including the City-constructed boardwalk and seawall. The Court further finds that Lindsley did not ever, and does not now, have any legitimate claim to this property.

In summary, the Court finds by clear and convincing evidence that Lindsley and Nala intentionally and knowingly made false representations of material facts relevant to the 1995 receivership proceeding and that they made these misrepresentations with the intent to mislead the court. The Court relied on Lindsley and Nala's misrepresentations to its detriment, resulting in the

prevention of a fair submission of the issues to the Court and the undermining of the Court's integrity in the receivership proceeding.

## *Piercing the Corporate Veil*

A basic tenet of corporate law is that a corporation exists independently of its stockholders or members who compose it. Individual shareholders are thus normally shielded from liability for the corporation's acts. Under Virginia law, however, the Court will disregard the corporate form when it is shown that the corporation was the (1) "alter ego, alias, stooge, or dummy" of the shareholder and (2), that it was a "device or sham used to disguise wrongs, obscure fraud, or conceal crime." *Cheatle v. Rudd's Swimming Pool Supply Co.*, 234 Va. 207, 212, 360 S.E.2d 828, 831 (1987). Disregarding the corporate form is an "extraordinary exception" and is permitted "only when it becomes necessary to promote justice." *Id.* (quoting *Beale v. Kappa Alpha Order*, 192 Va. 382, 397, 64 S.E.2d 789, 797 (1951)). For that reason, both elements of the *Cheatle* test must be met in order to pierce the corporate veil.

Applying the first prong of the *Cheatle* test, factors courts have used in evaluating the alter ego doctrine include failure to observe corporate formalities, non-payment of dividends, non-functioning of other officers or directors, absence of corporate records, and disregarding corporate formalities. *DeWitt Brokers, Inc. v. W. Ray Flemming Fruit Co.*, 540 F.2d 681, 685-87 (4th Cir. 1976). In the instant case, Lindsley was Nala's sole shareholder, director, and officer, and Nala had no employees. The evidence shows that Lindsley observed no corporate formalities, maintained no corporate books or minutes, and his personal and corporate affairs were indistinguishable. He paid for the services rendered to Nala and its predecessors-in-interest from a personal checking account. Nala never paid any dividends to Lindsley. Further, Lindsley signed every deed, wrote the property descriptions, annotated every plat, and signed or initialed every relevant document. He researched the titles and historical backgrounds himself and personally hired every attorney and title examiner that he used in his business. Nala's chain of title records regarding the disputed property show an extensive history of title transfers between and among Lindsley, Nala, and Lindsley's other wholly-owned corporations, including Fala and Kana. The deeds involved were all either deeds of gift or exchange, conveyed without warranty or English covenants of title. In each transaction, he retained a personal interest, either directly or collaterally, in the assets he transferred through the deeds.

Lindsley also structured Nala's approach to the 1995 receivership proceeding so that he would reap its benefits without risking his personal

interests. First, he conducted the extensive title examinations himself, then hired Byrd to research only the title to Virginia Beach Holding. He did not ask Byrd to research the title history of Soames Corporation or ask him to reconcile the two histories in light of the 1904 verdict in *Hall v. Cason*. Defendants concede in their trial brief that they knew the *Hall v. Cason* final order existed and that this "partially relieved" the "confusion" over the overlapping plats. After he completed his research, Byrd gave Lindsley a written report, but it only included the title history back to 1910, even though Byrd had actually traced the title all the way back to 1842. Byrd, on Lindsley's behalf, met with Heilig to review his report so Heilig would understand what Byrd had found. Lindsley then used Nala and its 16.66% interest in the purported property from the Soames receiver to bring the 1995 receivership proceeding. Defendants in their trial brief concede that Lindsley did this in preparation for litigating an action to quiet title with the City, and that "[t]his method was used to protect the bulk of the Soames shoreline interest and Mr. Lindsley's *personal assets* from the unusual risks inherent in bringing such a suit in Virginia Beach Circuit Court against the City." (Emphasis added.) Once Lindsley, through Nala, obtained the receiver's deed, he transferred the rest of his personal interest in the disputed property to Nala. Meanwhile, Lindsley, acting as president of Nala, now renamed Atlantic City Beach Corporation, transferred the four parcels obtained by the receiver's deed to Fala by deed dated December 29, 1995, and from Fala to Kana on February 20, 1997. On February 20, 1997, Lindsley thus had two chains of title on which to base his claim to portions of the Virginia Beach oceanfront; one through Soames and Nala to Atlantic City Beach Corporation and one through Virginia Beach Holding and Fala to Kana. Throughout all of these proceedings, transfers, facts, and circumstances, Lindsley and his corporations were indistinguishable from each other. The corporations were mere shells and the corporate names were shields for the sole purpose of hiding Lindsley's personal involvement. Lindsley used these corporations in his classic shell game; only nothing of any substance was under any of the shells. Nala and Lindsley were acting as one when Nala instituted the receivership proceeding, with Nala as Lindsley's alter ego, and thus the first prong of the *Cheatle* test is satisfied.

Likewise, the second prong of the *Cheatle* test is met in this case because Lindsley used his shell corporations as a "device or sham used to disguise wrongs, obscure fraud, or conceal crime." *Cheatle*, 234 Va. at 212, 360 S.E.2d at 831. In this case the evidence clearly establishes that Lindsley, as sole officer, director, owner, and shareholder of Nala and his other shell corporations, used the corporate form to obscure his fraud upon the court

regarding ownership of the disputed property. By exchanging deeds and changing property descriptions he created a chain of title. Further, in an effort to disguise his fraudulent conduct, Lindsley changed the names of these corporations at various times. This Court will therefore ignore the corporate formalities and hold both Nala and Lindsley personally responsible for the fraud perpetrated by him and Nala on the court in the 1995 receivership proceeding. Further, the Court finds that even in the absence of piercing Nala's corporate veil, Lindsley can be held personally accountable for his own wrongful and fraudulent acts.

## Conclusion

The Court holds that its order of January 13, 1995, appointing a receiver for Virginia Beach Holding Corporation should be vacated because it was procured by the fraud of the defendants Edwin B. Lindsley, Jr., and Nala Corporation and that the deed given by the receiver thereby appointed should be declared null and void. The Court also holds that none of the defendants own or have any interest through Soames Corporation in land east of the platted lots between 5th Street and Rudee Inlet in the City of Virginia Beach. Counsel for the City shall prepare an appropriate decree referencing this letter opinion. The decree shall provide that this cause remain on the Court's docket for consideration of the other remaining issues, including damages.

## December 5, 2000

This cause is before the court upon the Plaintiff's motion to increase the *ad damnum*. Having considered the memoranda submitted by the parties in support of their respective positions, the court concludes that the motion should be granted.

With the agreement of the parties, trial of this cause was bifurcated so that liability would first be litigated followed at a later time by proceedings to address the issue of damages. Trial of the liability issue concluded in July 2000, and the court's decision was rendered by its opinion letter of September 29, 2000. The court received no evidence at any time during that phase of the suit concerning damages.

This cause concerned ownership of certain portions of the sandy beaches of the Atlantic Ocean in the City of Virginia Beach in its resort area. While no evidence of the value of that property was presented, it is obvious that the value is extraordinarily high. Consequently, with such value at stake, it is not surprising that each of the parties expended significant time and expense in

preparing for litigation. Numerous expert witnesses, efforts to locate ancient documents affecting the title to the beach, and other trial expenses were unusually extensive. The court is of the opinion that such extraordinary efforts by both parties were not unreasonable. Indeed, the extensive preparation by counsel was essential in light of the serious issues raised and the potential monetary value to each party.

Because neither evidence nor argument has been presented on the damages question, neither party can be prejudiced by granting the plaintiff's motion. No final decree has been entered in this cause, and the court's authority to allow amendments of the pleadings before verdict is clear. *Powell v. Sears, Roebuck & Co.*, 231 Va. 464 (1986). Thus, the court will permit the plaintiff to increase its *ad damnum*.

The defendants also urge the court to dismiss the damages phase of this suit, saying, "Under Virginia common law, attorneys' fees and other litigation expenses are not recoverable unless so provided for [sic] by statute or by a contract between the parties." This is certainly an accurate statement of the general rule. *Prospect Development Co. v. Bershader*, 258 Va. 75, 92 (1999). The defendants, however, ignore the exceptions to that general rule, one of which involves fraud suits:

> We hold that in a fraud suit, a chancellor, in the exercise of his discretion, may award attorney's fees to a defrauded party. When deciding whether to award attorney's fees, the chancellor must consider the circumstances surrounding the fraudulent acts and the nature of the relief granted to the defrauded party.

*Id.*

In its letter opinion of September 29, 2000, the court found that the defendants knowingly and intentionally perpetrated a fraud in laying the foundation for its claims of ownership. Accordingly, the plaintiff's motion to increase the *ad damnum* will be granted, and the defendants' motion to dismiss the damages phase of the suit will be denied.